United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 20, 2006**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 05-20115

---

UNITED STATES OF AMERICA,

                                                    Plaintiff-Appellee,

versus

JOSE MARLON IBARRA-ZELAYA; JOSE
EFRAIN LINARES-TABORA; MARVIN
ARTURO PERALTA-RAMIREZ; HENRY
GUTIERREZ-ANDRADE; EDY
GUARDADO-MEZEN; ELBIN GEOVANY-MEZEN

                                                    Defendants-Appellants,

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before SMITH, WIENER, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The six appellants in this case appeal their convictions and sentences for hostage taking, 18 U.S.C. § 1203(a), and smuggling of illegal aliens, 8 U.S.C. § 1324. All of the appellants appeal on various sufficiency of the evidence grounds, and some of them appeal on additional grounds, ranging from challenges to sentencing, improper denials of motions to suppress, and improper voir dire and jury instructions. For the following reasons, we affirm the convictions, modify Elbin Geovany-Mezen's sentence on Counts Two and Three, and otherwise affirm the appellants' sentences.

## I. FACTUAL AND PROCEDURAL HISTORY

In March of 2004, a group of illegal immigrants arrived at an apartment in Houston, Texas, with a group of "coyotes" who the aliens and their friends and relatives paid to help smuggle them into the United States. On March 11, 2004, Jose Marlon Ibarra-Zelaya, Jose Efrain Linares-Tabora, Marvin Arturo Peralta-Ramirez, Henry Gutierrez-Andrade, Edy Guardado-Mezen, and Elbin Geovany-Mezen arrived at the apartment where the aliens were; all six of the men were armed. They announced that they wanted 15 of the male aliens whose fees had not yet been paid.

The appellants then began motioning at particular aliens with the guns, indicating which ones they would take with them. Guttierrez-Andrade and Geovany-Mezen went into another room in the apartment, still armed, threatened the aliens in that room, and selected a few of the aliens to go with them. The appellants then split the aliens into groups and loaded them into cars. While on the way to their destination, Gutierrez-Andrade gave his cell phone to the aliens in his car and told them to call their family members and tell them not to send the money to the original coyotes. No specific amount of money was mentioned as the appellants' new fee at this time.

About fourteen aliens were brought from the first apartment to a new one, also in Houston, with the appellants. They arrived at about 6 p.m. on March 11. All of the appellants were armed at all times in the new apartment and took turns guarding the aliens. While all the aliens and all the appellants were in a room together, Linares-Tabora, while armed, told the aliens not to "screw up, because otherwise [they'd] end up lying there." In addition to the aliens and the appellants, Griselda Barnica-Mazariegoz and her ten-year-old daughter, among others, were also in the apartment for at least some of the time the aliens were there.

2

The appellants then gave the aliens food, clothing, and alcohol.  Linares-Tabora took one of the aliens, Miguel Pacheco-Manchame, to Wal-Mart to buy some clothes.  Linares-Tabora followed Pacheco-Manchame around the store and asked him where he was going.  Linares-Tabora was armed and at one point told Pacheco-Manchame to "behave" or he could "hurt" him.  They paid for the clothes and then returned to the apartment.

While at the apartment, Geovany-Mezen and Linares-Tabora told the aliens to call their families to arrange for money to be sent to them instead of the initial coyotes.  Linares-Tabora spoke to one of the alien's relatives and made calls about monetary arrangements for some of the other illegal aliens as well.  Guardado-Mezen and Gutierrez-Andrade also made one alien call a friend of his to ask for more money despite the fact that the friend had already paid $2100 to the initial coyotes.  All of the appellants were present when Guardado-Mezen told the alien to call his friend for more money.

At around 1:30 a.m. on March 12, 2004, Houston police dispatch received a call about a hostage situation with weapons at the apartment where the aliens and the appellants were staying.  Uniformed officers arrived on the scene at around 2 a.m.  They saw four people exit the apartment and get into a car with an expired registration.  They stopped the car based on the traffic violation.

When none of the occupants of the car were able to produce valid identification, the officers began an investigatory detention.  The driver was Guardado-Mezen, and the passengers were Linares-Tabora, Pacheco-Manchame, and Barnica-Mazariegoz.  When none of the men could produce valid ID, they were placed in the patrol car.  Barnica-Mazariegoz stated that she had ID back at her apartment.  An officer asked her if she wanted to go get it and if he could come with her, and she said yes.

3

As they approached her apartment, Barnica-Mazarigoz stated that there were a few people in her apartment and knocked on the door. No one answered, and Barnica-Mazarigoz stated that she didn't have keys to the apartment. The officer heard people moving inside the apartment while they were waiting. Inside the apartment, Ibarra-Zelaya was moving the aliens from one room to another, directing them with his pistol. Guardado-Mezen told the aliens to tell the police they were at a party.

The door was opened three to five minutes later, and the officer saw three men fleeing the apartment via the balcony. There were many people in the living room. The officer then entered the apartment and began a sweep of the premises. He stated that he was worried about being "set up" and that safety was a concern. He found many people in various rooms in the apartment and moved them all into the living room. He then asked Barnica-Mazarigoz if he could search the apartment for weapons, and she told him that he could. No weapons were found at this point.

The officers then called immigration officials and were told it would be a few hours before they could get there. The officers began noticing that at least one of the appellants was constantly in one of the apartment's two bathrooms. They also noticed that the appellants would run their hands up and down Barnica-Mazarigoz and her daughter whenever they walked by. There was a second bathroom in the apartment that was off-limits to the appellants. However, Barnica-Mazarigoz asked to take her daughter to that bathroom, and the officers let her, although they did not let her close the door. An officer heard the daughter tell her mother "no"; he then entered the bathroom to find Barnica-Mazarigoz pulling her daughter's shirt up. He noticed the lid of the toilet was crooked, and when he looked in the tank, he found three loaded handguns. The officers at this point inspected the first bathroom as well and noticed that it looked like someone had tried to push through the wall separating the two bathrooms.

4

When this was discovered, an officer went to handcuff Barnica-Mazarigoz. Ibarra-Zelaya and Guardado-Mezen began to move toward the officer guarding the door of the apartment, and all the officers drew their weapons. The appellants were ordered to move against the wall, and they complied. After this, the appellants were moved to patrol cars, and immigration officials arrived a short time later.

Based on these events, the appellants were charged with alien smuggling and hostage taking. At a jury trial, they were found guilty of all counts and sentenced by the judge to various terms of imprisonment. The six appellants timely filed the current appeal alleging various grounds of error discussed below.

## II. DISCUSSION

### A. SUFFICIENCY OF THE EVIDENCE

All six of the appellants appeal their convictions under the Hostage Taking Act ("HTA"), 18 U.S.C. § 1203(a), on various sufficiency of the evidence grounds. In reviewing a challenge to the sufficiency of the evidence, this court views all evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt. *United States v. Carrion-Caliz*, 944 F.2d 220, 222 (5th Cir. 1991). In conducting this review, we accept all credibility choices and reasonable inferences made by the jury, and the standard remains the same whether the evidence is direct or circumstantial. *United States v. Nixon*, 816 F.2d 1022, 1029 (5th Cir. 1987).

To prove the offense of participating in a hostage taking under the HTA, the government must establish that the appellants (1) seized or detained another person, and (2) threatened to kill, injure, or continue to detain that person, (3) with the purpose of compelling a third person or entity to act

5

in some way as an "explicit or implicit condition for the release of the person detained." 18 U.S.C. § 1203 (a); *see also Carrion-Caliz*, 944 F.3d at 223.

The appellants in this case were charged with a hostage taking conspiracy and with aiding and abetting hostage taking. "Conspiracy requires direct or indirect agreement to commit hostage taking, knowledge that the purpose of the agreement was unlawful, and joinder in the agreement to further its unlawful purpose." *United States v. De Jesus-Batres*, 410 F.3d 154, 160 (5th Cir. 2005), *cert. denied*, 126 S.Ct. 1022 (2006). To aid and abet a crime, a defendant must associate with the criminal venture, participate in it, and seek by his actions to make the venture succeed. *United States v. Peters*, 283 F.3d 300, 308 (5th Cir. 2002). "The evidence supporting a conspiracy conviction is generally sufficient to support an aiding and abetting conviction as well." *United States v. Gonzales*, 121 F.3d 928, 936 (5th Cir. 1997).

First, Gutierrez-Andrade argues that the evidence that he seized or detained another person against his or her will is insufficient. He argues that none of the aliens testified that he harmed or threatened them. The government did present evidence, however, that Gutierrez-Andrade was present at the apartment where the aliens were kept by the original coyotes, that he was armed at this apartment, and that he participated in moving the aliens from one apartment to another. This is enough evidence to sustain Gutierrez-Andrade's conviction under the first prong of the HTA. There is no need for physical force or violence or even the threat of it to support this conviction. *Carrion-Caliz*, 944 F.2d at 225. All that is required is that Gutierrez-Andrade frighten or deceive the aliens into staying with him "when they would have preferred to" join their families or even remain with the first set of coyotes. *Cf. id.* at 226.

6

Gutierrez-Andrade and Geovany-Mezen challenge their convictions under the second prong of the HTA, that they threatened to kill, injure, or continue to detain the aliens. Gutierrez-Andrade again contends that because he didn't directly use or threaten physical harm, his conviction cannot be sustained. Geovany-Mezen contends that he never threatened anyone or told them they weren't free to leave. He also argues that his goal was to transport the aliens to their final destinations for a fee, not to hold them for a ransom. He states that to the extent there was a conspiracy under the HTA, there was no evidence at trial that he was aware of its illegal purpose.

Gutierrez-Andrade's actions at both the first and second apartments, including being armed and telling at least one alien to call his family to get money for his transport, is enough to support his conviction under the HTA. The evidence of Geovany-Mezen's actions, including brandishing a firearm and knowing of the requests made of the aliens' families for money, is sufficient to sustain his conviction as well. Based on the evidence presented at trial, a reasonable jury could have drawn an inference that implicit in the appellants' request that the aliens' families send money was the threat that the aliens would not be released if money was not sent. Even in the absence of this inference, the presence of guns at the second apartment was an implicit threat of continued detention to the aliens.

All of the appellants contend that the evidence presented by the government at trial was insufficient to prove the third element of the HTA, that they intended to compel a third party to act in some way. The appellants argue that no threat of harm to the aliens or continued seizure was ever communicated to a third party. A variant of this argument is that the appellants didn't intend to compel a third party to act but merely to collect money for the aliens' transport to their families.

7

They also argue that because there was no increase in the amount of money requested from the aliens' relatives and friends, there can be no conviction under the HTA.

First, there is no requirement under the HTA that there be communication of the threat to a third party. Instead, the requirement is that the appellants' actions be intended to compel a third party to act. This language doesn't require that the appellants be able to directly communicate that threat. Secondly, here the evidence shows that the appellants did attempt to communicate their demand for money both by having at least one alien call his relatives to tell them to send the money promised to the initial coyotes somewhere else and by calling at least one of the alien's relatives themselves and asking for money in addition to what was given to the initial coyotes.

Even if the appellants did not increase the amount of money requested by the original coyotes, they can still be convicted under the HTA. Just because the aliens were willingly with the first set of coyotes doesn't mean they were willingly with the appellants. There is no requirement under the HTA that there be an increase in the amount of money requested for criminal liability to attach; instead, the test is when the relationship becomes non-consensual as it did here when the appellants abducted the aliens from the apartment where they were initially. *Cf. United States v. Sierra-Velasquez*, 310 F.3d 1217, 1220 (9th Cir. 2002) ("There was a seizure within the meaning of § 1203(a) from the time the defendants began to hold the aliens in a manner that was not contemplated in the alien smuggling agreement. At that point, the aliens were no longer consensually in the custody of the smuggling defendants."). The fact that they didn't demand more money than the initial coyotes did is irrelevant to the third prong of the HTA. The government presented enough evidence to allow a reasonable jury to find all of the appellants guilty of violating the Hostage Taking Act.

8

## B. SUPPRESSION OF EVIDENCE

Guardado-Mezen and Gutierrez-Andrade raise and Ibarra-Zelaya, Peralta-Ramirez, and Geovany-Mezen adopt an argument that the district court erred in not suppressing the evidence of aliens and weapons found in the apartment because they were the product of an illegal search. As to Guardado-Mezen's appeal of the denial of his motion to suppress, this court reviews legal questions de novo and factual findings for clear error. *De Jesus-Batres*, 410 F.3d at 158. Gutierrez-Andrade and the other appellants who attempt to adopt this argument have waived their suppression arguments because they did not move to suppress any evidence in the district court. *See United States v. Chavez-Valencia*, 116 F.3d 127, 129 (5th Cir. 1997).

The police search of Guardado-Mezen's apartment rose out of the police's stop of Barnica-Mazariegoz who agreed to return to her apartment to get her ID after the other people in the car were handcuffed and detained. An officer testified that Barnica-Mazariegoz told him she didn't mind if he returned to her apartment with her, although she testified that the police threatened to arrest her if she did not return to get her ID. The district court believed police testimony that this statement was never made to Barnica-Mazariegoz, and we do not find clear error with this factual finding.

The district court found that the initial stop was legitimate under *Terry v. Ohio*, 392 U.S. 1 (1968), and that during this stop, Barnica-Mazariegoz consented to take the police to her apartment. Alternatively, the police accompaniment of Barnica-Mazariegoz to her apartment was part of the *Terry* stop. While the police entry into the apartment was not consensual, the search was a valid protective sweep justified by exigent circumstances. Later, after the police noticed suspicious behavior on the part of the appellants, the search in which the guns were found in the toilet tank was justified by probable cause.

9

Guardado-Mezen argues that the district court's determination that Barnica-Mazariegoz's consent to an officer's accompanying her to the apartment was voluntary was clearly erroneous. Based on the factors that this Circuit uses to determine voluntariness, *United States v. Tompkins*, 130 F.3d 117 (5th Cir. 1997), Guardado-Mezen contends it was error for the district court to find that no incriminating evidence would be found in the apartment and that there were no coercive police procedures used at the sight of the traffic stop. Because of these errors, he argues, Barnica-Mazariegoz's consent for the officers to accompany her to get her ID was not voluntarily given.

First, we do not find clear error in the district court's determination that the police's treatment of Barnica-Mazariegoz at the traffic stop was not coercive. Based on the district court's credibility findings, Barnica-Mazariegoz was not told she would be arrested if she did not return to her apartment to get her ID, nor was she handcuffed or threatened. Secondly, we do not find fault with the district court's finding that Barnica-Mazariegoz did not believe that incriminating evidence would be found. While it is clear that Barnica-Mazariegoz knew there were illegal aliens in her apartment, the district court found that Barnica-Mazariegoz did not know of a conspiracy to keep them as hostages and also heard testimony that the aliens in the apartment were told to say that they were at a party. Therefore, the officer's accompanying Barnica-Mazariegoz to her apartment was valid based on her voluntary consent.

At the time the officer entered the apartment with Barnica-Mazariegoz, we find that the search of the apartment was justified by exigent circumstances. The district court's finding of exigent circumstances is a factual finding reviewed for clear error. *De Jesus-Batres*, 410 F.3d at 158. There is particular deference to "the judgment of experienced law enforcement officers concerning the risks

10

of a particular situation." *Id.* at 159 (quoting *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997) (en banc)).

As in *De Jesus-Batres*, the circumstances in Barnica-Mazariegoz's apartment made it necessary for the officer to search the premises to determine what safety risks there were to himself and his fellow officers. While waiting outside, the officer could hear multiple people moving around inside the apartment. The door was opened three to five minutes after Barnica-Mazariegoz first knocked, and the officer observed several people fleeing the apartment via the balcony at that time. Because he was worried about a possible ambush or other danger to his fellow officers and any victims within the apartment, he conducted a quick sweep of the apartment looking for other people, at which point he found several illegal aliens. The district court's finding of exigent circumstances on these facts was not clear error.

The later search which produced the guns was justified by probable cause. The initial tip to the police involved a hostage situation with weapons. Although the officers did not discover any weapons during their initial sweep, the peculiar behavior of the appellants, Barnica-Mazariegoz, and her daughter, as well as the movement of the toilet, were circumstances that aroused the officers' suspicions that guns were present in the apartment. Therefore, we affirm the district court's denial of Guardado-Mezen's motion to suppress.

### C. OBJECTIONS TO VOIR DIRE AND JURY INSTRUCTIONS

#### 1. Geovany-Mezen

Geovany-Mezen argues that the district court's voir dire of the jury was improper because of the judge's statements about the role of the grand jury system, including a statement that the grand jury decided there was probable cause that a crime had been committed. Geovany-Mezen also

11

contends that the court told the jurors that the people in the apartment were illegal aliens who were being held against their will. Finally, during the giving of a jury instruction on the elements of conspiracy, the court made the statement "I think it's clear, ladies and gentlemen, but here you have to find what winds up to be everyone of these things in the list," a statement that Geovany-Mezen believes could be interpreted as an expression by the judge that she thought the elements of the crime had been clearly established, while the government argues that the statement was clearly meant to direct the jury that they had to find each element of the conspiracy. Geovany-Mezen argues that these errors, taken cumulatively, constitute reversible error.[1]

Because Geovany-Mezen objects for the first time on appeal to the statements of the district court during voir dire and while instructing the jury, his claims are subject to plain error review. *United States v. Phipps*, 319 F.3d 189 n.14 (5th Cir. 2003). For relief to be granted under plain error review, an appellant must show (1) error (2) that is plain and (3) that affects substantial rights. If all three of these requirements are met, a court may exercise its discretion to grant relief only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Mares*, 402 F.3d 511, 520 (5th Cir.), *cert. denied*, 126 S. Ct. 43 (2005).

Geovany-Mezen's argument about the comments of the district court during voir dire fails under the first prong of the plain error test. The comments of the district court about the role of the grand jury were not error at all and are of the type that this court has approved before. *See, e.g., United States v. Faulkner*, 488 F.2d 328 (5th Cir. 1974). The judge's comments about the illegal status of the victims were not in error because the illegal status of the aliens was undisputed. *See*

___

[1]To the extent that Ibarra-Zelaya, Peralta-Ramirez, and Guardado-Mezen adopted by reference the issues raised by their co-appellants, the following analysis of these claims applies to their appeals as well.

*United States v. Inocencio*, 40 F.3d 716, 729 (5th Cir. 1994) ("A judge may point out undisputed facts to the jury without error."). The district court's statements about the fact that the victims may have been "guarded" or "held" also were not error because she expressly stated that whether or not this actually happened was what was at issue in this trial. Because the district court's statements were not improper and did not prejudice the jury, there is no error.

Geovany-Mezen's arguments about the district court's instruction on conspiracy to commit hostage taking also fails because the error was not plain. If Geovany-Mezen's interpretation of the statement is correct, the district court's statement to the jury that "it's clear" would mean that the court thought the elements of the case had been obviously proven, but it is by no means certain that Geovany-Mezen's interpretation was correct. Taking into account the court's instruction to the jury as a whole, we do not find that the instruction was so clearly erroneous as to result in the likelihood of a grave miscarriage of justice. *Incoencio*, 40 F.3d at 729. Because the error, if there was error, is based on an ambiguous statement, there can be no relief under the plain error standard.

## 2. Linares-Tabora

Linares-Tabora argues that the district court improperly increased the scope of the word "ransom" as it was used in a sentencing factor submitted to the jury after defense counsel made his closing arguments. This court reviews Linares-Tabora's challenge to a jury instruction for abuse of discretion. *United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002). In determining whether a jury instruction is erroneous, this court determines whether the charge as a whole is a correct statement of the law and whether it clearly instructs the jury on the law applicable to the facts. *United State v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2004). An error in a jury instruction is subject to harmless error review. *Id.*

13

The trial in this case was held after *Blakely v. Washington*, 542 U.S. 296 (2004), was decided but before *United States v. Booker*, 543 U.S. 220 (2005), was decided. Because of the resulting confusion about the effect of *Blakely* on the U.S. Sentencing Guidelines, the district court in this case submitted to the jury supplemental questions about whether it was proved beyond a reasonable doubt that the appellants demanded a ransom in connection with Counts Four and Five of the superceding indictment, a specific guideline sentencing factor.

The court initially instructed the jury that ransom "is money or other payment demanded in exchange for the release of a person who has been seized or detained." Counsel in the case based their closing arguments to the jury on this definition. After the case had been submitted to the jury, the jury asked the judge if it should find this issue proved only as to those "that actually physically made ransom telephone calls or for everyone who expected ransoms to be received." The judge decided to instruct the jury that it could answer yes to the ransom question if the ransom request was a reasonably foreseeable act in furtherance of the appellants' jointly undertaken activity. Linares-Tabora objected to this "expansion" of the reach of the sentencing factor.

Between the time of the jury's findings on this issue and Linares-Tabora's sentencing, *Booker* was decided. At the actual sentencing, the district court noted that it would find the sentencing factors by the preponderance of the evidence and that it considered the jury's findings on the matter advisory only.

We make no finding about whether or not the district court's instruction to the jury on the meaning of the word "ransom" was in error because we find that the passage of *Booker* and the district court's own findings on the sentencing factors render the issue moot. Any error that may have occurred is harmless because the district court specifically found Linares-Tabora personally

14

made ransom calls to a victim's family by both a preponderance of the evidence and beyond a reasonable doubt, rendering him eligible for the sentencing increase regardless of the jury's findings on the issue and regardless of which definition of ransom applied.

## D. OBJECTIONS TO SENTENCING

### 1. Challenge to Counts Four and Five

Ibarra-Zelaya, Peralta-Ramirez, Guardado-Mezen, and Geovany-Mezen contend that their sentences on Counts Four and Five are unreasonable and disproportionate under 18 U.S.C. § 3553. These appellants argue that the district court did not consider the punishment that similar behavior would merit and point out that someone with no criminal record who causes another to die during an alien smuggling offense would warrant at most 71 months in prison. They also argue that the district court considered itself bound by the Sentencing Guidelines, resulting in what they consider unreasonable sentences.

This court reviews the appellants' sentences for reasonableness. *Mares*, 402 F.3d at 520. We do not find any error on the part of the district court in sentencing the appellants on Charges Four and Five; therefore, the sentences given by the district court are given great deference. *Id.* The court made a statement on February 4, 2005, recognizing *Booker* and the advisory nature of the Guidelines. The court expressly considered the 18 U.S.C. § 3553 factors as required by *Booker* and then decided the sentences for appellants' convictions under the HTA. Because these were crimes under the HTA, not merely crimes relating to the smuggling of aliens, we find that the appellants' sentences were reasonable.[2]

---

[2]To the extent that Guardado-Mezen, Ibarra-Zelaya, Geovany-Mezen, and Peralta-Ramirez raise a separation of powers challenge to the Guidelines, that challenge is addressed by *Mistretta v. United States*, 488 U.S. 361, 364 ("Congress, of course, has the power to fix the sentence for a federal

B. Challenge to Counts Two and Three

Geovany-Mezen argues that his sentence on Counts Two and Three of the superceding indictment is limited to five years because those counts were charged on an aiding and abetting theory. The punishment for aiding and abetting is limited to five years. *De Jesus-Batres*, 410 F.3d at 164. The Charges make it clear that Geovany-Mezen was charged and convicted on these counts of aiding and abetting the harboring of illegal aliens. Accordingly, we modify the judgment as to Geovany-Mezen to reflect a five-year prison sentence on Counts Two and Three. This modification does not affect the overall terms of the imprisonment because Geovany-Mezen's concurrent sentences on Counts Four and Five exceed the modified sentence on Counts Two and Three. *See generally id.*

III. CONCLUSION

For the following reasons, we AFFIRM the appellants' convictions, MODIFY Geovany-Mezen's sentence on Counts Two and Three to reflect a five-year term of imprisonment, and otherwise AFFIRM the appellants' sentences.

---

crime, and the scope of judicial discretion with respect to a sentence is subject to congressional control."). To the extent that Peralta-Ramirez and Ibarra-Zelaya raise a claim of cruel and unusual punishment under the Eight Amendment, we decide under *Mares* that the sentences in this case were reasonable and thus not cruel and unusual. To the extent that Peralta-Ramirez and Ibarra-Zelaya raise a Fifth Amendment due process challenge, this claim is moot because the district court judge decided the sentence under *Booker* and found sentencing factors existed beyond a reasonable doubt.