# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 25, 2014

Lyle W. Cayce
Clerk

No. 13-40322

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

HAI VAN SCHAFFER; ADOLPH GAMEZ, JR.,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Texas
No. 4:10-CR-134-3

Before KING, GRAVES, and HIGGINSON, Circuit Judges.

PER CURIAM: [*]

Hai Van Schaffer[1] and Adolph Gamez, Jr. appeal their convictions on one count of conspiring to possess five kilograms or more of cocaine with the intent to distribute it, in violation of 21 U.S.C. § 846 and § 841(a)(1). For the following reasons, we AFFIRM both Schaffer's and Gamez's convictions.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Schaffer's last name is spelled "Schaeffer;" however, we will use the spelling "Schaffer," which has been used throughout the proceedings.

No. 13-40322

## I.   FACTUAL AND PROCEDURAL BACKGROUND

This case centers around an undercover investigation of a conspiracy to illegally distribute drugs in Plano, Texas.  Without reciting the entire course of the undercover investigation, it is important to detail how Schaffer and Gamez were implicated in the conspiracy at issue here.  In the months before April 2010, Christopher Frosch, a detective with the Rowlett Police Department, was working on an investigation into the distribution of ecstasy in Plano.  On May 5, 2010, Frosch, who was acting in an undercover capacity, first met James Wood, who was identified as someone willing to engage in a drug transaction.  Wood indicated to Frosch that his drug supplier was Hai Van Schaffer.  Subsequently, it was decided that on June 2, 2010, Frosch would purchase cocaine from Wood.  Frosch also spoke with Schaffer over the phone to plan the details of the transaction.  Ultimately, the June 2, 2010 transaction did not take place; however, Frosch and Wood did meet.

On the evening of June 2, 2010, Frosch and Schaffer discussed a second transaction over the phone.  Schaffer explained how he and "[his] people" handle transactions, and how his "guys" prefer to count their money and "stuff" (cocaine) to "make sure that everything's there and everything's in check."  Frosch expressed hesitation about whether he wanted to conduct a second transaction: "I don't know if there's gonna be a next time man."  Schaffer stated that he had a location for transactions "where we do it very privately, in a very private neighborhood," where "we've been doing it for a couple years."  He further explained that "everybody knows our routine."  Schaffer explained to Frosch how the next transaction would take place.  He also assured Frosch that "these guys are consistent with their stuff all the time," and that the cocaine was "legit."  Next, Schaffer reiterated that he should have "taken the reins in my hand like I normally do, and . . . mad[e] [the previously attempted transaction] work right."  Schaffer explained that he was not looking for "the

2

No. 13-40322

short term gain," but rather "a long term relationship." He also stated that "there's a lot of money to be made for everybody." Schaffer and Frosch eventually agreed that Frosch would purchase 15 kilograms of cocaine.

On June 10, 2010, Wood and Daryl Preston, another co-conspirator, gave a bag filled with five kilograms of cocaine to Frosch. Wood and Preston were subsequently arrested. Upon being stopped by the police, Wood called Schaffer to let him know that the deal was a set-up. As this was happening, Matt Quillen, an officer with the Plano Police Department ("PPD") who was involved in the investigation and surveillance of Wood and Schaffer, followed Schaffer's car from Schaffer's residence. Quillen contacted a marked patrol unit, which conducted a traffic stop of the vehicle. Schaffer was ultimately arrested near a McDonald's. Adolph Gamez was arrested around the same time as Schaffer, after he was observed bringing the cocaine to Schaffer's residence earlier in the day.

On June 11, 2010, the United States Attorney filed a criminal complaint against Gamez, Schaffer, and four others. On July 7, 2010, all six defendants were indicted in a one-count indictment charging that

> from sometime in or about January 2009, and continuously thereafter up to and including May 12, 2010, in the Eastern District of Texas and elsewhere . . . defendants[] did knowingly and intentionally combine, conspire, and agree with each other, and with other persons known and unknown to the United States Grand Jury, to knowingly and intentionally possess with the intent to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, a violation of 21 U.S.C. § 841(a)(1)[, and] [i]n violation of 21 U.S.C. § 846.

Schaffer and Gamez were tried together by jury in June 2011.

At the trial, the Government offered evidence that an off-duty police officer with the PPD, Sergeant Terry Holway, arrested Schaffer at a dance club on March 14, 2010 ("March 14 arrest") on an outstanding warrant. After

3

No. 13-40322

Schaffer was arrested, Holway's partner performed a search of Schaffer and found "a small baggy of cocaine" in his pocket, as well as three and a half pills that Holway believed "were hydrocodone and alprazolam, which is Xanax." Holway asked Schaffer if the baggy contained "cocaine or methamphetamine," to which Schaffer responded, "[y]eah." The substance tested positive for cocaine in a field test. Holway testified that, based on her experience and the packaging of the cocaine, she believed Schaffer "was going in to sell [the cocaine] or give it to somebody." When Holway asked Schaffer where he was taking it, he responded, "[t]o a business partner." Holway testified that the amount of cocaine that Schaffer had on him, approximately 1.9 grams, was "too much to do in one night," and that it was a "distributable amount."

The Government filed a pre-trial notice that it intended to offer evidence of Schaffer's March 14 arrest under Federal Rule of Evidence 404(b). The Government alternatively argued that the evidence was intrinsic to the offense because it showed that Schaffer "had the intent to distribute," and the incident "falls squarely within that time frame of when he's distributing cocaine," as outlined in the indictment. The district court conducted a *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), analysis and described the evidence regarding the March 14 arrest as "404(b) [e]vidence." The court did not formally rule that the evidence was admissible under Rule 404(b), but instead rested its admissibility determination on the conclusion that the evidence was intrinsic to the charged offense. Specifically, the district court found that the arrest was "within the time frame of the indictment and involves cocaine and possessing it and it involves his admission that he was going to distribute it."

During the trial, Officer Quillen testified that he "just briefly" had an opportunity to question Schaffer immediately following the June 10 arrest, and he "asked him where he was going to." Schaffer "told [Quillen] he was going to

4

the McDonald's" that was in the vicinity of the traffic stop. Quillen also asked Schaffer his name. Drug Enforcement Administration ("DEA") special agent Tahariiq Gray testified that he arrived at the traffic stop shortly after Quillen spoke with Schaffer. The following exchange took place at trial, during Gray's direct examination:

> Q. Okay. And was Mr. [Schaffer] inside the vehicle?
>
> A. When I got there, he was not inside the vehicle, he was out of the vehicle. And when I got there, the Plano Police Department detectives advised that they had spoken to Mr. [Schaffer] and he wasn't being cooperative at the time.

Schaffer did not make a contemporaneous objection to the testimony. The Government did not refer to Gray's statement in its closing argument. The record does not indicate when Schaffer received a *Miranda* warning, or whether he received the warning before speaking with the officers.

On the fourth day of the trial, outside the presence of the jury, the court conducted a hearing on evidence that the government intended to submit under Federal Rule of Evidence 404(b), including evidence that Schaffer "had asked another inmate to contact . . . Schaffer's parents, his father specifically, to try to bribe [the Assistant United States Attorney] to dismiss th[e] case." The Government had previously placed the inmate, Juan Rios, on its witness list, and had informed the court that Rios would testify to the conversation he had with Schaffer. The Government informed the court that it would not pursue the testimony about the attempted bribery during the guilt phase of the trial, but would present it at sentencing. The Government also indicated that it might cross-examine Schaffer's father ("Mr. Schaeffer") about the attempted bribery, if he took the stand. Schaffer's counsel did not object or respond in any way.

No. 13-40322

After the Government rested its case, Schaffer moved for a directed verdict on the basis that the activities for which he was arrested took place after May 2010 (the ending date of the conspiracy designated in the indictment). Gamez joined Schaffer's motion. Gamez argued that the language in the indictment was a "fatal defect," and that it was "substantially prejudicial . . . that all of the conduct that they've alleged . . . is outside of the date period in the indictment." The district court denied the defendants' motions for a directed verdict.

On the fifth and final day of the trial, Mr. Schaeffer testified for the defense. The defense asked Mr. Schaeffer whether Schaffer's criminal charge was "in keeping with the child that [Mr. Schaeffer] raised," and Mr. Schaeffer responded "No." Mr. Schaeffer also responded negatively when asked whether there was anything "from [his] knowledge and background of Hai [Schaffer], to prepare [Mr. Schaeffer] for this kind of charge." Lastly, Mr. Schaeffer responded affirmatively when asked whether Schaffer "appear[ed] to be having . . . a normal lifestyle."

On cross-examination, the Government asked Mr. Schaeffer several questions about his knowledge of specific examples of Schaffer's conduct, including Schaffer's March 2010 arrest and his admission to "being in the drug-distribution business for at least two years." The Government also asked the following question:

> Q. Mr. Schaeffer, were you aware that your son was trying to have another inmate contact you to pay Mr. Gonzalez 30 to 50 thousand dollars to make the case go away?

Schaffer's counsel objected to the question, and the court recessed the jury. Schaffer's counsel contended that the government was "getting into hearsay" with its question. The court expressed concern about "throw[ing] out" the bribery question for the jury with "no definitive answer," given that the

6

No. 13-40322

Government had already rested its case and had not called Rios to testify about the attempted bribery.  The Government indicated that it would withdraw the question; the court stated that it would "instruct the jury to disregard the question, not consider it for any purpose."  Accordingly, when the jury returned, the court stated: "Ladies and gentlemen, before we resume, I need to instruct you to disregard the last question.  Do not consider it for any purpose." Schaffer did not object to the instruction or move for a mistrial.

Once the evidence was submitted to the jury, the district court conducted a lengthy hearing regarding whether to give the jury an instruction regarding the entrapment defense.  After giving both the Government and the defense an opportunity to address the question, the district court ruled that it would not instruct the jury on entrapment.  Subsequently, the jury found both defendants guilty.  The district court sentenced the defendants-appellants, and they timely appealed their convictions.

## II.   SCHAFFER'S CHALLENGES

Schaffer argues that the district court erred at trial by declining to instruct the jury on his proposed entrapment defense; by admitting evidence of the March 14 arrest as intrinsic evidence; and by admitting testimony that he was "uncooperative" following his arrest.  Schaffer further argues that the government committed prosecutorial misconduct during his trial; that he received ineffective assistance of counsel; and that the cumulative effect of the alleged errors at trial entitles him to a new trial.  We address these claims in order.

### A. Entrapment Instruction

"We review the district court's decision not to grant an entrapment instruction *de novo*, looking at the evidence in the light most favorable to the defendant."  *United States v. Nelson*, 732 F.3d 504, 513 (5th Cir. 2013). Although entrapment is a question for the jury and not the court, in order "for

7

an entrapment instruction to be put to the jury, a defendant must make a prima facie showing of two elements: (1) lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense." *Id.* at 514 (internal quotation marks omitted). Both elements assist the court in making the "critical determination" of "whether criminal intent originated with the defendant or with the government agents." *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997).

In order to determine "whether the defendant lacked predisposition, we consider whether he 'intended, was predisposed, or was willing to commit the offense *before first being approached by government agents.*'" *Nelson*, 732 F.3d at 514 (emphasis in original) (quoting *United States v. Theagene*, 565 F.3d 911, 919 (5th Cir. 2009)). "[A] defendant's eager willingness to participate in government-solicited criminal activity is sufficient to prove predisposition." *United States v. Reyes*, 239 F.3d 722, 741 (5th Cir. 2001). We have found that "[a] defendant lacks predisposition where he had no prior interest or experience related to the crime, displayed 'significant hesitation or unwillingness, or attempt[ed] to return discussion to lawful conduct.'" *Nelson*, 732 F.3d at 514 (quoting *Theagene*, 565 F.3d at 920). It may be taken as evidence of predisposition that the defendant was an "active, enthusiastic participa[nt] or demonstrated expertise in the criminal endeavor." *Id.* at 515 (internal quotation marks omitted).

"Government inducement consists of the creative activity of law enforcement officials in spurring an individual to crime." *Theagene*, 565 F.3d at 922 (internal quotation marks omitted). "Evidence that government agents merely afforded the defendant an opportunity . . . for the commission of the crime is insufficient to warrant the entrapment instruction." *United States v. Bradfield*, 113 F.3d 515, 522 (5th Cir. 1997).

No. 13-40322

Schaffer argues that the drug transaction with Frosch was at a standstill and that it was the Government's prodding that made it come to fruition. He further argues that he was a reluctant participant in the drug conspiracy and that, but for the Government's efforts, the conspiracy would not have begun. In support of these arguments, Schaffer highlights the testimony of his father who stated that the charges against Schaffer were not "in keeping with the child that [I] raised." Although Schaffer acknowledges that the jury could have concluded that he was a willing participant, he argues that they jury should have been instructed on entrapment to allow it to evaluate the merits of the defense.

After a review of the record, with the evidence viewed in Schaffer's favor, he does not show that his entrapment defense was "plausible enough that the jury deserved a chance to evaluate it." *Theagene*, 565 F.3d at 922. As to Schaffer's predisposition, he "demonstrated expertise in the criminal endeavor," *Nelson*, 732 F.3d at 514, when he described to Frosch, in depth, how he usually conducted drug transactions, when he indicated that "there's a lot of money to be made for everybody" from such drug transactions, and when he described how the drugs would be packaged to deter detection. Schaffer did not express "significant hesitation or unwillingness" when presented with the opportunity to make a second attempt to transact with the undercover officer. *Theagene*, 565 F.3d at 920. In fact, he was an eager participant, which he demonstrated by encouraging the hesitant officer to make a second attempt at the drug transaction. Mr. Schaeffer's vague testimony concerning his impression of Schaffer's character cannot rebut the evidence that Schaffer was an "active, enthusiastic participant in the crime." *Nelson*, 732 F.3d at 515 (internal quotation marks and brackets omitted). As to inducement, Schaffer fails to assert how the June 10 transaction amounted to anything more "than simply providing an opportunity or facilities to commit the offense." *Theagene*,

9

565 F.3d at 922. In short, the district court did not err when it declined to provide the jury with an entrapment defense instruction.

**B. Admission of Other Act Evidence**

The court reviews a district court's evidentiary rulings for abuse of discretion, subject to harmless-error analysis. See *United States v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011). "For any of the evidentiary rulings to be reversible error, the admission of the evidence in question must have substantially prejudiced the defendant's rights." *Id.* at 318 (internal quotation marks and brackets omitted).

The district court referred to the evidence relating to the March 14 arrest as both "404(b) evidence" and "intrinsic" evidence. Although the court performed a *Beechum* analysis, its ruling on admissibility rested on its conclusion that the evidence was intrinsic. We need not decide whether the district court was correct when it held the March 14 arrest evidence to be intrinsic, because that evidence was properly admitted pursuant to Rule 404(b) of the Federal Rules of Civil Procedure.

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* This court held in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978), that Rule 404(b) requires a two-step analysis: "[f]irst, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character," and "[s]econd, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403." *Id.* at 911.

10

"We have previously held that in a conspiracy case, the defendant puts his intent into issue when he pleads not guilty." *United States v. Heard*, 709 F.3d 413, 430 (5th Cir. 2013). Accordingly, Schaffer's possession of a "distributable amount" of cocaine and other drugs on March 14 and the fact that he admitted that he was taking it "to a business partner" are clearly relevant to establishing Schaffer's intent to participate in the conspiracy at issue here. As for the second prong of the *Beechum* analysis, "we must take care not to infringe upon the broad discretion of the trial court regarding the relevance, probative value, and prejudicial effect of evidence." *United States v. Bermea*, 30 F.3d 1539, 1562 (5th Cir. 1994) (internal quotation marks and citation omitted). Given that the evidence regarding the March 14 arrest was within the time frame alleged by the indictment and involved possession by Schaffer of a "distributable amount" of cocaine, we conclude that the probative value of the evidence was not substantially outweighed by any undue prejudice. Therefore, the evidence was properly admitted.

## C. Evidence that Schaffer was "uncooperative"

The Supreme Court has established that "use of [a] defendant's post-arrest silence" to impeach a defendant is a violation of due process. *Doyle v. Ohio*, 426 U.S. 610, 611 (1976). "Ordinarily, we review a constitutional question *de novo*." *United States v. Potts*, 644 F.3d 233, 236 (5th Cir. 2011). However, where, as is the case here, an appellant "did not properly preserve his claim of error regarding the prosecutor's comments on his post-arrest silence in the district court, we review this claim only for plain error." *United States v. Salinas*, 480 F.3d 750, 755 (5th Cir. 2007). In order to establish plain error, "the defendant must show that (1) there is an error, (2) the error is clear or obvious, and (3) the error affects his substantial rights." *Id.* at 756 (internal quotation marks omitted). For the error to be considered plain, it must have been clear under existing law. *See id.* "If those three conditions are satisfied,

this court may grant relief if 'the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Ibarra-Zelaya*, 465 F.3d 596, 606 (5th Cir. 2006)).

Schaffer argues that it was a violation of his Fifth Amendment right to remain silent when DEA Agent Gray testified that the "Plano Police Department Detective advised that they had spoken to Mr. Schaffer and he wasn't being cooperative." However, Gray's statement that Schaffer was not "being cooperative" was likely not a comment on Schaffer's supposed post-arrest silence,[2] but a spontaneous comment suggesting that Schaffer's explanation for where he was going when the police pulled him over—he stated he was en route to McDonald's—rang hollow under the circumstances. As such, it is likely that Gray's statement was not a comment on Schaffer's silence and did not implicate Schaffer's Fifth Amendment rights. *See Salinas*, 480 F.3d at 756 ("[T]he Supreme Court has established that due process prevents the prosecution from commenting at trial on a criminal defendant's silence. . . .").

Given that the test for a *Doyle* violation is "whether the manifest intent of the remarks was to comment on the defendant's silence, or (stated another way) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence," *United States v. Pennington*, 20 F.3d 593, 599 (5th Cir. 1994) (internal quotation marks omitted), it is difficult to see how the jury could consider the vague remark, "wasn't being cooperative," as a comment on Schaffer's silence. Moreover, the remark was "a spontaneous comment by the witness," not "a comment prompted by the prosecutor." *United States v. Andaverde-Tiñoco*, 741

---

[2] The record does not establish whether Schaffer's discussion with the police officers occurred before or after he received a *Miranda* warning.

F.3d 509, 521 (5th Cir. 2013) (quoting *United States v. Moreno*, 185 F.3d 465, 472 (5th Cir. 1999)).  This analysis leads us to reject Schaffer's argument, regardless of whether he received a *Miranda* warning before his short discussion with the police officers.  *See Doyle*, 426 U.S. at 619 (addressing post-arrest, post-*Miranda* silence); *Salinas*, 480 F.3d at 758 (addressing post-arrest, pre-*Miranda* silence*)*.

**D. Prosecutorial Misconduct**

This court applies a "two-step analysis to claims of prosecutorial misconduct." *United States v. Davis*, 609 F.3d 663, 677 (5th Cir. 2010).  "First, we assess whether 'the prosecutor made an improper remark.'"  *Id.* (quoting *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007)).  If so, we then ask if the defendant was prejudiced because of the prosecutor's remark.  *Id.*  "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007) (internal quotation marks omitted).  We determine whether the prosecutor's remark cast serious doubt on the correctness of the jury's verdict by considering three factors: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Davis*, 609 F.3d at 677 (internal quotation marks omitted).  While we review "the propriety of the prosecution's arguments de novo, we review the question of whether or not the defendant's substantial rights were affected under the abuse of discretion standard." *United States v. McCann*, 613 F.3d 486, 494 (5th Cir. 2010).

Schaffer argues that his substantial rights were affected when the prosecutor, on cross-examination of Schaffer's father, asked, "Mr. Schaeffer, were you aware that your son was trying to have another inmate contact you to pay [the Assistant United States Attorney] 30 to 50 thousand dollars to

No. 13-40322

make this case go away?" We disagree because we find that this question was proper. Under Federal Rule of Evidence 405(a),

> [w]hen evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.

We have "explained that '[o]nce a witness has testified concerning a defendant's good character, it is permissible during cross-examination to attempt to undermine his credibility by asking him whether he has heard of prior misconduct of the defendant which is inconsistent with the witness' direct testimony.'" *United States v. Skelton*, 514 F.3d 433, 444 (5th Cir. 2008) (quoting *United States v. Wells*, 525 F.2d 974, 976 (5th Cir. 1976)).

Schaffer's father had testified on direct examination to Schaffer's good character. He was asked whether there was anything in Schaffer's background to prepare him for the news of the drug conspiracy charge, whether Schaffer was employed since graduating from college, and whether he had a "normal lifestyle." These questions were clearly asked by the defense as a means to establish Schaffer's good character and to attempt to show that he was not predisposed, for entrapment purposes, to commit the offense. As such, the prosecution's question on cross-examination about Schaffer's attempted bribery was proper under the Federal Rules of Evidence, given that the record shows that the prosecutor had a good faith basis to ask the question. Accordingly, the prosecutor did not make an improper remark and there was no prosecutorial misconduct. *Davis*, 609 F.3d at 677 (prosecutorial misconduct is assessed by asking whether prosecutor made improper remark).

**E. Ineffective assistance of trial counsel**

Schaffer argues that we should, on direct appeal, consider his ineffective assistance of counsel claim. He highlights a number of points in the trial where

14

he believes his lawyer made errors sufficient to establish an ineffective assistance of counsel claim.  However, we decline to reach this claim "because it is premature." *United States v. Montes*, 602 F.3d 381, 387 (5th Cir. 2010). In this circuit, the "general rule . . . is that a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations." *Id.* (quoting *United States v. Gulley*, 526 F.3d 809, 821 (5th Cir. 2008)).  We will only consider a claim of ineffective assistance of counsel on direct appeal "in those rare occasions where the record is sufficiently developed." *Gulley*, 526 F.3d at 821.  If the record does not allow us to "fairly evaluate the claim . . . we must decline to consider the issue without prejudice to a defendant's right to raise it in a subsequent proceeding." *Id.*

Schaffer's ineffective assistance claim was not raised before the district court.  As a result, the record is not sufficiently developed for the court to fairly evaluate the claim that Schaffer's attorney was ineffective.  As in *Montes*, this case "falls within th[e] general rule because the record reveals neither the reasons for [Schaffer's] attorney's decisions nor the availability of alternative strategies." 602 F.3d at 387.  Schaffer makes no persuasive argument for why this is one of the "rare occasions" in which the court should evaluate his claim on direct appeal.  Accordingly, we decline to reach his ineffective assistance of counsel claim.

### F. Cumulative effect

Schaffer next argues that the "cumulative effect" of the errors he has identified was to deprive him of a fair trial.  The cumulative error doctrine "provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v.*

No. 13-40322

*Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012) (en banc) (internal quotation marks and citation omitted). There being no error, the cumulative error doctrine has no application.

### III.    GAMEZ'S CHALLENGE

Gamez raises one issue on appeal: the adequacy of the indictment. He asserts that it was impermissibly vague, and that it "failed to allege the correct time period in which most of the criminal conduct occurred." Gamez argues that since the "majority of testimony centered around a 'buy bust' on June 10, 2010 that resulted in [his] arrest," and the indictment alleges conduct from "sometime in or about January 2009, and continuously thereafter up to and including May 12, 2010," most of the evidence at trial concerned events outside of the dates alleged in the indictment. As a result of this alleged deficiency, Gamez argues that he was unable to properly prepare a defense, and that he was unable to ensure that his prosecution was based on facts previously presented to the grand jury.

Gamez waived his challenge to the indictment by failing to raise it before trial. *See* Fed. R. Crim. P. 12(e); *United States v. Whitfield*, 590 F.3d 325, 359 (5th Cir. 2009) ("Failure to comply with this rule generally constitutes waiver.").[3] Nevertheless, we will review the alleged errors relating to the adequacy of the indictment here for plain error. *See United States v. Hoover*, 467 F.3d 496, 498 n.2 (5th Cir. 2006) (citing *United States v. Rodriguez*, 360

---

[3] On December 1, 2014, absent congressional action, revisions to Federal Rule of Criminal Procedure 12 will take effect. These revisions will alter the rule's "waiver" provision by making it a "timeliness" provision: "Consequences of Not Making a Timely Motion Under Rule 12(b)(3). If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Gamez has never attempted to show "good cause" for why he failed to make a timely motion challenging the indictment.

F.3d 949, 958 (9th Cir. 2004) (reviewing alleged insufficient indictment for plain error when raised for first time in a Rule 34 motion)). [4]

This court has held that in the conspiracy context "[a]n allegation as to the time of the offense is not an essential element of the offense charged in the indictment, and, within reasonable limits, the offense need only occur before the return of the indictment and within the statute of limitations." *United States v. Valdez*, 453 F.3d 252, 259–60 (5th Cir. 2006) (internal quotation marks and citation omitted). We have previously found that "[a] five-month variance between the date alleged and the date proved is not unreasonable as a matter of law as long as the date proven falls within the statute of limitations and before the return of the indictment." *Girod*, 646 F.3d at 316–17 (5th Cir. 2011) (internal quotation marks omitted); *see also Russell v. United States*, 429 F.2d 237, 238 (5th Cir. 1970) (finding that in the conspiracy context "within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient.").

Given that the "buy bust" and Gamez's arrest occurred on June 10, 2010, there is no question that the offense conduct occurred both before the return of the indictment, which was on July 7, 2010, and within the statute of limitations. *See* 18 U.S.C. § 3282 (establishing five year statute of limitations). The facts here are well within the five-month discrepancy we concluded in *Girod* was not an unreasonable variance between the evidence presented at trial and the indictment, 646 F.3d at 316, since the "buy bust" took place on

---

[4] *Rodriguez* dealt with a situation where the defendant brought his challenge to the indictment for the first time in a Rule 34 motion, after he had pled guilty and judgment had been entered. 360 F.3d at 958. The defendant argued that he was entitled to *de novo* review, whereas the government argued that the review should be for plain error because the "post-judgment Rule 34 motion does not constitute pre-trial review." *Id.* The Ninth Circuit sided with the Government and conducted a plain error review. *Id.* Here, Gamez brought his challenge for the first time after the Government rested its case-in-chief.

No. 13-40322

June 10, 2010, and the indictment listed May 12, 2010 as the end date of the conspiracy. Moreover, Gamez fails to explain how the indictment failed to provide him with "the substantial safeguards . . . an indictment is designed to provide." *Russell v. United States*, 369 U.S. 749, 763 (1962) (internal quotation marks omitted). He was fully aware of the charges against him, and the criminal complaint, issued the day after his arrest, indicated that the criminal conduct ran "up until the present." Given these circumstances, Gamez cannot establish that he is entitled to relief.[5]

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the Defendants' convictions.

---

[5] Gamez's reliance on *United States v. Cecil*, 608 F.2d 1294 (9th Cir. 1979) is misplaced. *Cecil* is distinguishable because the temporal language of the indictment there was "open-ended in both directions," *id.* at 1297, which is not the case here. In *Cecil*, the indictment alleged that the conspiracy had "beg[un] *on or before* July, 1975, and continu[ed] thereafter until *on or after* October, 1975." *Id.* (emphasis added). The Ninth Circuit held that "the indictment fail[ed] to allege sufficient facts to facilitate the proper preparation of a defense and to ensure that the defendants were prosecuted on facts presented to the Grand Jury," because of the open-ended nature of the indictment's time frame. *Id.* The indictment here has an end date of "up to and including May 12, 2010," which is definitive; accordingly, the concerns recognized by the Ninth Circuit in *Cecil* do not apply here.