[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 18-10080

————————————————

D.C. Docket No. 2:16-cr-00323-SLB-JHE-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

WILLIE LEE COOKS,
a.k.a. Little Man,

Defendant - Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama

————————————————

(April 3, 2019)

Before TJOFLAT, NEWSOM, and GILMAN,[*] Circuit Judges.

NEWSOM, Circuit Judge:

---

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the United States Court of
Appeals for the Sixth Circuit, sitting by designation.

In the ordinary case, an arrest warrant doesn't automatically authorize police to search the arrestee's residence—the home search requires its own warrant. This isn't the ordinary case.

The question here is whether police violated the Fourth Amendment when they conducted a warrantless search of the crawlspace in Willie Lee Cooks's home following a four-hour standoff that the responding officers deemed a hostage situation and that culminated in Cooks's arrest. Here's the short version: Rather than submitting to arrest, Cooks barricaded himself in his house, thereby preventing at least two occupants from leaving. Shortly after the police arrived, and as they were trying to coax Cooks out of the residence, they heard what sounded like a power drill being used inside. The officers were able to make contact with one of the occupants, who told them that Cooks was "doing something in a hole in the floor." When the standoff ended and the officers entered the house several hours later, they found the hole, which had been covered by a piece of plywood that was screwed down from the outside. They pried it up, found that it led to a crawlspace, and discovered there an arsenal of firearms.

As in all Fourth Amendment cases, we must determine the reasonableness of the officers' actions by reference to what they knew at the time. Just as important here is what the officers didn't know—specifically, how many additional individuals might be in the house. Although the government has presented several

2

theories to justify the search in light of the officers' uncertainty, we need address only one here. We hold that the warrantless search of Cooks's crawlspace was lawful under the exigent-circumstances doctrine, as the officers had probable cause to believe that the hole might contain additional hostages.

## I

## A

The events underlying this case began when a team of officers from the U.S. Marshals Service's Gulf Coast Regional Fugitive Task Force and Counter Gang Unit sought to arrest Cooks at his home. Cooks, a member of the "Bloods" street gang, was wanted for second-degree assault by the Birmingham Police Department. The officers initially knocked on his door, but when no one answered, they entered the house by force. They left after a brief survey of the residence revealed that it was empty.

The team returned at around 10:30 a.m. the next day. While surveilling Cooks's home, the officers saw a car leave the residence twice, and when it returned the second time at about 12:30 p.m., they ordered the driver—Precious Clemens—to stop. Clemens apparently had no interest in talking to them, as she ran inside the house and locked the door. Although attempts to communicate with Clemens through the door were unsuccessful, two of the home's other occupants—Pamela Price and Everstein Johnson—were more cooperative. When Officer

3

Crendal Deramus asked Price and Johnson to open the door, they told him that they couldn't because the door had been barricaded and locked from the inside using a deadbolt for which they didn't have a key.

It was around that time that officers started hearing what they would later describe as "sounds similar to a power drill" coming from inside the house. As best they could tell, the sounds came from "the immediate area of the front door." They couldn't see inside, though, because the residence had tinted windows throughout. Shortly thereafter, Price was able to exit the house briefly, and before going back inside she told the officers that Cooks was armed. Concluding that they were facing a potential hostage situation, the officers decided to call the Jefferson County SWAT team. When the SWAT team arrived, a hostage negotiator made contact with Price and another unknown occupant, both of whom reiterated that they wanted to leave but couldn't, and one of whom stated—without further explanation—that Cooks was "doing something in a hole in the floor" of the house.[1] When the negotiations to open the barricaded front door failed, the SWAT team deployed tear gas.

---

[1] Presumably reflecting the chaos of the scene, the officers had different recollections about who mentioned Cooks's work on the hole in the floor. Deramus thought that the second individual was Johnson, a male. SWAT Sergeant Billy Watts, by contrast, thought that he had spoken to "two different females."

At 4:30 p.m.—roughly an hour later, and four hours after the initial contact with Clemens—the standoff came to an end.  The SWAT team broke a window and extracted Price and Johnson from the house, at which point Price reiterated that Cooks was "doing something in the floor."  This time, though, she elaborated that Cooks had put multiple guns in a hole in the floor.  The barricade sealing the front door was removed, and the SWAT team swarmed the house and took Cooks and Clemens into custody.

After arresting Cooks, the officers performed an initial 30-second sweep, followed by a three- to five-minute secondary sweep.  In the process, they found a four-by-four-foot hole covered by plywood that, they later explained, had been "hastily" "nailed down with screws."  According to Deramus, they hadn't seen the hole during the prior day's entry.  The officers used a crow bar to remove the plywood covering and found that it led to the home's crawlspace.  SWAT Deputy Douglas Lawson—described as "one of the smaller members of the SWAT team who was often called upon to go into small spaces"—entered the hole.  As he put his hand down to brace himself, he felt a plastic tarp move and, under it, saw the butt of a gun in plain view.  When Lawson shined his flashlight around the crawlspace, he saw more guns sticking out from underneath the plastic.

Thirty minutes to an hour after the initial sweep—and still without a search warrant—the officers called Special Agent Steve Owens with the Alabama Law

5

Enforcement Agency to the scene to inventory the guns that they had discovered in the crawlspace. Owens found several pistols and long guns both underneath and protruding from the tarp, along with several pieces of unopened luggage that officers later determined contained additional firearms. At this point, the officers decided to seek, and thereafter obtained, a search warrant for Cooks's home. All told, the officers seized nine pistols and 22 long guns from the crawlspace.

**B**

The Government later charged Cooks with two counts of unlawful possession of a firearm under 18 U.S.C. § 922(g)(1). Because the officers initially searched the crawlspace without a warrant, Cooks moved to suppress the guns, contending that even if the officers could lawfully sweep part of the house, "pulling up floor boards and crawling under the house . . . was overbroad for a protective sweep." The government responded to Cooks's protective-sweep arguments, and further countered that the search was justified under the exigent-circumstances doctrine because the officers didn't know "if anyone else was inside the residence or inside the hole in the floor." In the officers' minds, the government explained, the crawlspace could have contained individuals "injured from the effects of the tear gas . . . [or] by actions of the defendant himself."

The government's exigent-circumstances theory was thus largely predicated on the idea that the house could have contained other individuals besides the four

known occupants—Cooks, Clemens, Johnson, and Price.[2]  The officers candidly acknowledged that they weren't quite sure who might have remained.  Lawson, for instance, testified at the suppression hearing that they entered the hole in order "to secure it and make sure there wasn't anybody hiding down there that could harm us."  Slightly differently, Deramus said that although he personally believed that all of the house's occupants had been accounted for, he couldn't rule out the possibility that either additional "bad guy[s]" or "potential hostages" remained.  For his part, SWAT Sergeant Billy Watts explained that the officers "had no idea how many were [in the house]," elaborating that while they "believed there to be four people in the house from the conversations" that they had with the occupants, they "were still not sure at that point."

The magistrate judge charged with deciding Cooks's suppression motion in the first instance rejected the government's protective-sweep justification, concluding that although a limited sweep of the house was justified, it couldn't lawfully extend to a search of the crawlspace.  Specifically, he emphasized that there was "no evidence that any officer observed anything about the . . . hole that would indicate that a dangerous person was inside," and that although the officers' threat assessment was conceivable, "conceivability does not suffice for

---

[2] The government separately argued that Price's statement "that [Cooks] had placed guns in a hole in the floor . . . created another exigent circumstance which the police could not ignore."

7

reasonableness." The fact that the plywood was nailed down from the outside, the magistrate judge explained, undermined the case for opening it as part of a protective sweep because any hypothetical assailant "would have been effectively locked in." Moreover, the magistrate questioned the extent of the intrusion, as "the government offer[ed] neither authority nor argument for why prying up the nailed-down plywood covering the hole suffices for a cursory visual inspection," as required of a protective sweep under *Maryland v. Buie*, 494 U.S. 325 (1990).

Even so, the magistrate judge recommended that the district court deny Cooks's motion to suppress on the ground that the officers' search was lawful under the exigent-circumstances doctrine. While for protective-sweep purposes it was "not reasonable for the officers to conclude the . . . hole contained a person ready and able to launch on attack," the magistrate determined that "a reasonable officer could have believed a hostage could be underneath the plywood covering." That was so, the magistrate judge reasoned, because the "officers already had a basis to conclude that people had been kept inside the house against their will." Under the exigent-circumstances doctrine, the magistrate judge concluded, no warrant was necessary here because "a hostage should not have to wait for a warrant to be freed."

The district court adopted the magistrate judge's report and recommendation in full. Thereafter, Cooks pleaded guilty to both counts under § 922(g)(1) but

8

reserved the right to challenge the denial of his motion to suppress. This appeal followed.[3]

## II

Let's start with the basics. The Fourth Amendment provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. Whether in light or in spite of that language, Fourth Amendment cases have come to be governed by the principle that warrantless searches are presumptively unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Nowhere is this more true, and important, than in the context of the search of a "home"—the "first among equals" in Fourth Amendment land. *See Florida v. Jardines*, 569 U.S. 1, 6 (2013). Given this privileged status, warrantless searches of homes "bear heightened scrutiny." *Kentucky v. King*, 563 U.S. 452, 474 (2011) (citing *Payton v. New York,* 445 U.S. 573, 586 (1980)).

---

[3] Our review of the district court's denial of Cooks's motion to suppress involves mixed questions of law and fact. "[W]e review the district court's factual findings for clear error, and its application of the law to the facts *de novo*." *United States v. Williams*, 871 F.3d 1197, 1199 n.2 (11th Cir. 2017) (quotation marks omitted). We "may consider any evidence that appears in the record" and must construe the facts "in the light most favorable to the prevailing party"— here, the government. *United States v. Smith*, 741 F.3d 1211, 1218 (11th Cir. 2013).

One of the "well-delineated exceptions" to the presumptive warrant requirement is undisputed here. Cooks doesn't deny that once the officers were in the crawlspace the firearms were in plain view and, therefore, were seizable so long as the officers were lawfully there. *See Horton v. California*, 496 U.S. 128, 136–37 (1990). Cooks *does* deny, though, that the officers were lawfully in the crawlspace—arguing that they violated the Fourth Amendment by prying open the crawlspace's plywood hatch. If he's right, the search of the crawlspace—and the ensuing seizure of the firearms—was invalid. *See id.* at 136 ("It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."). Accordingly, whether the officers were justified in searching the crawlspace without a warrant is the sole and dispositive question before us.

## A

On appeal, the government makes the same arguments that it made to the magistrate judge to justify the crawlspace search—along with a few new ones. First, the government reiterates that the crawlspace might have contained additional captives, adding that "Cooks—the person keeping [the hostages]—had been doing something mysterious with the hole." Second, and for the first time on appeal, the government contends that Cooks could have placed a "confederate" in

the hole "for the purpose of ensuring the confederate's escape, possibly with evidence, or for the purpose of destroying evidence." Third, the government asserts—also for the first time on appeal—that "Cooks might have placed something dangerous under the floor, such as an explosive device." Finally, the government renews its position that the search of the crawlspace was within the permissible scope of a lawful protective sweep.

We needn't reach the question whether the search can be justified as a part of a protective sweep or based on either of the government's newly articulated theories. As explained below, we agree with the district court that the search was justified under what has come to be known as the "emergency-aid" aspect of the exigent-circumstances doctrine.

**B**

The exigency umbrella "encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). We are principally concerned here with "risk of harm to the public"—sometimes called the "emergency-aid" aspect of the exigent-circumstances doctrine. *See, e.g.*, *King*, 563 U.S. at 460.

In order to justify an exigent-circumstances search, the government bears the burden of "demonstrat[ing] both exigency and probable cause." *Id.* at 1337. In the emergency-aid context, "the probable cause element may be satisfied where officers reasonably believe a person is in danger." *Id.* at 1338; *see also United States v. Timmann*, 741 F.3d 1170, 1178 (11th Cir. 2013) (probable cause satisfied where officers reasonably believe that someone "is seriously injured or threatened with such injury, and is in need of immediate aid" (quotation marks omitted)). Separately, the government must also demonstrate that the resulting search was "'strictly circumscribed' by the nature of the exigency that authorized it" and "limited to the areas where a person reasonably could be found." *Montanez v. Carvajal*, 889 F.3d 1202, 1209 n.4 (11th Cir. 2018) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)).

The officers here, Cooks contends, "exceeded the scope of a warrantless search" by "forcefully break[ing] into spaces in [his] home"—namely, the hole and connected crawlspace—"without providing specific and articulable facts as to why they believed an individual was in the space." Br. of Appellant at 12. We will address, in turn, whether the search was justified and, if so, whether it was appropriately circumscribed.

12

**1**

It's clear that the hostage situation at Cooks's residence—which is how the police perceived the situation—created an exigency of the sort that would justify a warrantless search. *See United States v. Mancinas-Flores*, 588 F.3d 677, 687 (9th Cir. 2009) (collecting decisions that "have recognized that an ongoing hostage situation presents exigent circumstances"). The real question here is whether the exigency remained ongoing during the officers' search of the crawlspace—in particular, that they could have reasonably believed that the hole could have contained someone who was "in danger," *Holloway*, 290 F.3d at 1338, or "in need of immediate aid," *Timmann*, 741 F.3d at 1178.

To be fair, there are arrows pointing in both directions. Before the magistrate judge, for instance, the government argued that Pamela Price had "informed police that [Cooks] had placed guns in a hole in the floor," thereby "creat[ing an] exigent circumstance which the police could not ignore." But while Price's statement may provide some support for the government's protective-sweep theory—which hinges on the risk of a hidden assailant or other danger to police—it arguably cuts *against* its emergency-aid position. If Cooks really had additional hostages in the house, why would he have stashed them in the vicinity of weapons? Doing so would seem to be counterproductive to the aim of holding someone against his will.

13

But it's not our role to armchair quarterback the officers' decision, and other considerations strongly support the government's emergency-aid argument. In assessing the reasonableness of officers' actions, we cannot indulge "the 20/20 vision of hindsight," but instead must adopt the "perspective of a reasonable officer on the scene"—which, here, entailed an armed standoff with a gang-member fugitive that had evolved into a hostage situation. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). We can't get caught up in facts that the officers couldn't have known at the time—namely that, as it turned out, there weren't any additional captives in Cooks's hole or crawlspace. Rather, we must be mindful that the police "must act quickly, based on hurried and incomplete information." *Holloway*, 290 F.3d at 1339. Put simply, the Fourth Amendment's reasonableness requirement gives officers facing exigent circumstances ample "breathing space to do the best they could with the information they had." *Montanez*, 889 F.3d at 1210.

Nowhere is this "breathing space" more crucial than in situations where life and limb may be in jeopardy. The "most urgent" of exigent circumstances, we have said, is "the need to protect or preserve life in an emergency situation." *Timmann*, 741 F.3d at 1178. In the same way, we have emphasized that "[i]t is difficult to imagine a scenario in which immediate police action is more justified than when a human life hangs in the balance." *Holloway*, 290 F.3d at 1337.

14

Accordingly, where the exigencies demand it, "the sanctity of the home . . . must give way to the sanctity of human life." *Id.* Of course, the officers must still have probable cause—*i.e.*, a "reasonabl[e] belie[f that] a person is in danger," *id*. at 1338—but if they do, they needn't hesitate. As we stressed in *Holloway*—quoting then-Judge Warren Burger—"[p]eople could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." *Id.* at 1340 (quoting *Wayne v. United States,* 318 F.2d 205, 212 (D.C. Cir. 1963)). Accordingly, officers "must be given the authority and flexibility to act quickly, based on limited information, when human life is at stake." *Id.* at 1339–40.

Given the weight that our precedent places on the need to protect human life, was it reasonable for the officers here to believe that Cooks's hole might have contained additional hostages? We think it was. For starters, in adopting, the magistrate judge's R&R, the district court found that "the officers believed there were four people in the house *but were not sure whether there were others*." Testimony at the suppression hearing amply supported that finding; several officers said that they thought that the house might contain additional occupants— or, at the very least, couldn't rule out that possibility. Watts, for instance, said that the officers "had no idea" how many people were in the house. Deramus, too, explained that the SWAT team cleared the house to "make sure no one else was in

15

there, either [a] bad guy or any other potential hostages."[4]  The Fourth

Amendment's reasonableness criterion gave the officers the "breathing space" they

needed to test their hypothesis, lest a possible injured innocent be further imperiled

by the delay inherent in securing a search warrant.

Moreover, the drilling that the officers heard surely heightened concerns.  A

reasonable officer, we think, could rule out innocent explanations for the sounds—

it was exceedingly unlikely that Cooks was simply trying to finish up a home-

improvement project before the police whisked him away.  That the drilling sounds

started shortly after the police arrived, and seemed to come from behind a

barricaded door, suggested two possibilities, neither good: Cooks was trying to

hide either something or someone that he didn't want the police to find.  The

---

[4] Cooks emphasizes Deramus's testimony that he personally believed—and that the task force officers "were still on the same understanding"—that the house contained only four people. Deramus was far less certain than Cooks suggests, however, as evidenced by this colloquy at the suppression hearing:

> **Question**: At that point, when Ms. Price, Ms. Clemons, Mr. Johnson, and the defendant were secured, did you know if there was anybody else in the house?
>
> **Deramus**: No, I did not.
>
> **Question**:  Could there have been additional people, hostages, or people who wanted to hurt the police?
>
> **Deramus**: Yes, sir.

In any event, the question is not whether Deramus or any other particular officer subjectively believed that there were additional hostages.  Rather, we are limited to determining whether "the circumstances, viewed *objectively*, justify the [officers'] action[s]."  *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (emphasis added and quotation marks omitted).

officers couldn't be sure which it was unless and until they searched the hole, especially given that the house's tinted windows rendered it one big blind spot.

Cooks responds that the "officers had not been informed," and "did not hear or otherwise detect signs," that a "hostage was being kept in the crawlspace."  Br. of Appellant at 14.  The dissent agrees, emphasizing that "the officers did not observe anything to indicate that someone was in the crawlspace, let alone that someone there was in immediate danger."  Dissenting Op. at 26.  But police don't "need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception."  *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (quotation omitted).  Given the length of the standoff, the fact that Cooks already held two people against their will, the uncertainty about other occupants, and the bizarre drilling sounds, we think it clear that the officers here acted within the zone of reasonableness.[5]

---

[5] The dissent takes issue with the fact that the officers didn't "call down into the crawlspace to inquire whether anyone was there."  Dissenting Op. at 27.  Their failure to do so, the dissent says, suggests that the "'hostage in the crawlspace' explanation was an after-the-fact justification for the illegal search concocted by the government."  *Id.* at 27–28.  The Supreme Court has long recognized, however, that speculation about the government's true motives has no place in the assessment of objective reasonableness.  *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 812–13 (1996).  Along the same lines, the Court has explained in the emergency-aid context, in particular, that "even if the failure to summon medical personnel conclusively established" that the officers did not believe that someone was injured, the test, as already noted, "is not what [they] believed, but whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger."  *Fisher*, 558 U.S. at 49 (quotation omitted).

Moreover, and in any event, our task is not to opine—with the benefit of hindsight—on the optimal path that the officers could have taken, but rather to assess the reasonableness of the path that they took.  As the Supreme Court has said in another context, a "creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by

Indeed, searches under the emergency-aid exception have been upheld in circumstances that would seem to be far less ominous than those here. In *Fisher,* for example, officers arrived at a scene to find, among other red flags, a truck "with its front smashed," a house with broken windows, and drops of blood in several places. 558 U.S. at 45–46. And though the officers saw the defendant "screaming and throwing things" in the house, they apparently couldn't tell—from their vantage point—if another person bore the brunt of his anger. *Id.* at 46. The Supreme Court found the application of the emergency-aid exception to be "straightforward" because, among other reasons, "[it] would be objectively reasonable to believe that [the defendant's] projectiles might have a human target (perhaps a spouse or a child)." *Id.* at 48.

Moreover, in *Johnson v. City of Memphis*, the Sixth Circuit held that the "combination of a 911 hang-up call, an unanswered return call, and an open door with no response from within the residence"—without more— sufficed to justify an exigent-circumstances search. 617 F.3d 864, 869 (6th Cir. 2010). Notably, in so holding, the court based its conclusion not only on "the information [that the officers] had," but also—and just as we do here—on "the importance in these situations of the information the responding officers d[id] *not* have." *Id.* at 871 &

---

which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985). The dissent's preferred "alternative means" of searching for hostages does nothing to undermine the reasonableness of the officers' actions here.

18

n.2. We break no new ground in concluding that reasonable inferences based on both knowns and known unknowns—rather than concrete evidence of harm alone—can establish probable cause to believe that an innocent is in danger and "in need of immediate aid." *Timmann*, 741 F.3d at 1178.

Our recent decision in *Montanez v. Carvajal* further reinforces our conclusion that the officers here acted reasonably. The police in *Montanez* interrupted what they thought was a residential burglary and detained two suspects outside the house. *See* 889 F.3d at 1205. Into an open door, an officer shouted, "Sheriff's office, come out if anybody's in there," but he got no response. *Id.* at 1206. Soon after discovering that the door had been pried open, the officers entered the home to search "for additional perpetrators and victims" and found contraband in plain view. *Id.* Although the district court in that case found that the officers "had no reason to believe anyone else was involved," we emphasized that "a responding officer will rarely know (or have any real way of knowing) whether he's rounded up everybody." *Id.* at 1209. "[P]erhaps more importantly," we further observed, "[t]here could be victims in [the house] too, and in light of the violence that often accompanies home invasions, it's not unreasonable to think that those victims might be incapacitated, unconscious, or otherwise in need of assistance." *Id.* Accordingly, and "[g]iven the immediacy of a potential victim's

19

needs," we held that "the Fourth Amendment permit[ted] a limited warrantless sweep of the home to search for both perpetrators and potential victims." *Id.*

That's not to say that *Montanez* is on all fours. Inherent in a residential burglary is the risk that the homeowner will catch the perp in the act and wind up a victim. Executing an arrest warrant doesn't necessarily carry with it a corresponding risk—say, that the arrestee will hold individuals against their will in a hidden compartment. Even so, the same concerns regarding the uncertainty about potential victims and the immediacy of their needs are equally (if not more) pressing in the context of a four-hour hostage standoff. Just as in a burglary gone wrong, Cooks's hostages could have been "incapacitated, unconscious, or otherwise in need of assistance." *Id.* Here, as in *Montanez*, swift action could have been the difference between life and death for an injured innocent; accordingly, here, as there, "[i]t would make no sense to compel an officer . . . to quit the scene to procure a warrant, thereby jeopardizing . . . the safety of potential victims inside the house." [6] *Id.* at 1210.

---

[6] To be clear, we are not sanctioning what Cooks calls a "general crime scene exception." Supp. Br. of Appellant at 3. The circumstances here are more dramatic than, and by no means representative of, the "general crime scene." We think it fair to assume that it will be the rare case in which the target of an arrest warrant barricades himself inside a house and holds other occupants captive, and the even rarer case in which that individual sets about to conceal a secret room with plywood and power tools. Given the uniqueness of the circumstances here—this was, after all, a hostage situation—we think that the dissent overstates matters when it suggests that our holding gives officers carte blanche "to search any crawlspace, closet, shed, or other enclosed space not covered by a lawful protective sweep." Dissenting Op. at 30.

20

**2**

Given that the officers had probable cause to believe that the crawlspace contained additional hostages, the final question is whether the search was proportional to that exigency. *Mincey*, 437 U.S. at 393. Cooks contends that it wasn't; he says that the search—specifically, the officers' use of a crow bar to break open the "locked" plywood "door"—was more intrusive than necessary. Br. of Appellant at 12.

We disagree. Even the most intrusive of government actions may be warranted where the preservation of human life is at stake. *Cf. Fisher*, 558 U.S. at 46 (upholding the entry of a house under the emergency-aid exception where "[t]he back door was locked, and a couch had been placed to block the front door"). The "immediacy of a potential victim's needs," *Montanez*, 889 F.3d at 1209, doesn't become any less pressing when she is behind a door locked from the outside. In fact, the opposite would seem to be true—assuming she is conscious, she can't open the "door" to call for help. Accordingly, the fact that the plywood plank here was screwed down—while potentially undermining the case for a protective sweep—strongly supports the government's emergency-aid argument.

The ultimate question is whether the intrusion was "strictly circumscribed" and "limited to the areas where a person reasonably could be found." *Id.* at 1209 n.4. It was. The hole and crawlspace were big enough to stash a person—a child

21

or a small adult (as Lawson's entry indicates).  The search, moreover, took no longer than necessary to verify that the crawlspace was empty.  We therefore reject Cooks's argument that the officers exceeded the scope of a lawful exigent-circumstances search by prying open the plywood "door."

## III

For the foregoing reasons, we hold (1) that it was reasonable to believe that Cooks's crawlspace—which was covered by a makeshift plywood "door"—might have contained hostages, and (2) that the officers were therefore justified in removing the plywood cover and briefly searching the crawlspace without a warrant.  Because we conclude that the search was lawful under the emergency-aid aspect of the exigent-circumstances doctrine, we needn't reach the question whether the search was justified under any other theory.  Accordingly, we affirm the district court's decision to deny Cooks's motion to suppress.

**AFFIRMED.**

GILMAN, Circuit Judge, dissenting:

I respectfully disagree with the majority's conclusion that the warrantless search of Willie Lee Cooks's covered crawlspace was lawful under the exigent-circumstances exception to the search-warrant requirement. Nothing in the record suggests that the officers who arrived at Cooks's home to arrest him believed that Cooks was hiding hostages in the crawlspace or, more importantly, that the situation presented an objective reason to so believe. To the contrary, two officers explicitly testified at the suppression hearing that they had no information whatsoever indicating that there were any people remaining inside Cooks's home, let alone inside of the covered crawlspace, after they removed the four persons of whom they were aware. The government's after-the-fact attempt to justify the officers' search with varying theories presented for the first time on appeal further undermines its position.

Rather than focusing on what information was available to the officers at the time of the warrantless search at issue, the majority focuses on what the officers could not "rule out." *See, e.g.*, Maj. Op. at 15. This court, however, has held that, in applying the exigent-circumstances exception, "speculation, without any factual support, will not suffice to overcome the warrant requirement." *United States v. Lynch*, 934 F.2d 1226, 1233 (11th Cir. 1991).

23

Law-enforcement officers might never be able to positively "rule out" the potential of danger to the public when executing an arrest warrant in a residence. But for the exigent-circumstances exception to apply and render a warrantless search lawful, the "officers must have an objectively reasonable belief that someone inside is seriously injured or threatened with such injury, and is in need of immediate aid." *United States v. Timmann*, 741 F.3d 1170, 1178 (11th Cir. 2013) (internal quotation marks omitted). The fact that Cooks's crawlspace "might have contained additional hostages," *see* Maj. Op. at 15, did not give the officers authority to enter that enclosed space without a warrant in the absence of any objective fact suggesting that a hostage was likely inside. I therefore respectfully dissent.

## I.

Warrantless searches and seizures inside a person's home are "presumptively unreasonable" under the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 586 (1980). But there are certain exceptions to the warrant requirement, with the government bearing the heavy burden of proving that an exception applies and that probable cause existed. *United States v. Blasco*, 702 F.2d 1315, 1325 (11th Cir. 1983) ("Because the protections of the [F]ourth [A]mendment are crucial to a free and viable society, the government shoulders a heavy burden of justifying the failure to obtain a warrant prior to the intrusion.").

24

One such exception to the warrant requirement is the "exigent-circumstances exception," which recognizes that a "warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978).

"The most urgent of these [exigent circumstances] is the need to protect or preserve life in an emergency situation." *Timmann*, 741 F.3d at 1178 (internal quotation marks omitted).  In order for the exception to apply, the officers must have probable cause to believe that an exigent circumstance exists. *United States v. Franklin*, 694 F.3d 1, 7 (11th Cir. 2012).  The standard is an objective one, and the officers' subjective motivations are irrelevant. *Timmann*, 741 F.3d at 1178.

Accordingly, various courts have found exigent circumstances to enter someone's home or an enclosed space within the home without a warrant in potential hostage situations.  But the officers in those cases have had articulable, objective reasons to believe that hostages were likely present in the space being searched. *See, e.g.*, *United States v. Ibarra-Zelaya*, 465 F.3d 596, 605 (5th Cir. 2006) (holding that exigent circumstances existed to search an apartment without a warrant when officers received a tip that hostages were being held there and the officers could hear multiple people moving around inside); *Satchell v. Cardwell*, 653 F.2d 408, 411 (9th Cir. 1981) (holding that exigent circumstances existed to

search a trailer without a warrant when officers received a tip that two women were being held at the address and one of the officers heard voices coming from inside the trailer).

During the officers' standoff with Cooks in the present case, they learned that Cooks was armed, that there were four people in Cooks's home (including Cooks), and that Cooks had been "doing something in a hole in the floor." The officers had also heard sounds "similar to a power drill" coming from inside the residence. But the officers had already removed the four people of whom they aware from Cooks's home at the time the crawlspace was searched. After the hostages had been secured and Cooks and Clemons had been taken into custody, the officers did not observe anything to indicate that someone was in the crawlspace, let alone that someone there was in immediate danger.

And once the officers had removed Price from Cooks's home, Price explained that what Cooks was doing "in the floor" was putting guns in the crawlspace. Price's statement weighs heavily against a finding that the officers had probable cause to believe that someone was in danger in the crawlspace, as the majority frankly concedes. Maj. Op. at 13. This is especially so because the officers knew that Cooks was a "gang-member fugitive." Maj. Op. at 14. That knowledge would have (or certainly should have) caused the officers to realize

26

how unlikely the possibility that Cooks would have placed hostages and guns in the same location.

In addition, the officers explicitly testified that they had no reason to believe that any additional people were inside of Cooks's home, much less inside of the enclosed crawlspace. Officer Deramus testified that he knew that there were four people in the home based on "voice communication" and who he "actually saw," and that his belief that only four people were in the home never changed. Sergeant Watts also testified that he did not "have any information whatsoever that more than four [people] were in" the home. Simply put, the officers provided no articulable fact at the evidentiary hearing that would support an objective belief that there were any hostages in the crawlspace. *See United States v. Johnson*, 22 F.3d 674 (6th Cir. 1994) (holding that although the discovery of a kidnap victim locked in an apartment provided exigency for entry, there was no exigency to search for and remove weapons from a closet once the victim was located).

Finally, if the officers had a reason to believe that there were additional hostages in Cooks's home, then they could have asked any of the four people they had removed whether anyone else was inside. Officer Deramus testified that he never so asked. Nor did any officer call down into the crawlspace to inquire whether anyone was there. The fact that no officer thought to ask whether anyone else was inside the home or in the crawlspace further supports the conclusion that

27

there was no objective reason to believe that a hostage was inside. This absence of inquiry also supports the conclusion that the "hostage in the crawlspace" explanation was an after-the-fact justification for the illegal search concocted by the government. Along the same lines, the various (and outlandish) additional justifications offered by the government for the first time on appeal—that the officers could have reasonably believed that a confederate was in the crawlspace escaping with evidence or that Cooks placed an explosive device in the floor— support that conclusion as well.

The main testimony that the majority points to as affirmatively supporting the possibility of a hostage being in Cooks's crawlspace is that the officers heard drilling coming from inside his home. Maj. Op. at 16. From this, the majority suggests one of two possibilities: that Cooks was hiding either something or someone in the crawlspace. Maj. Op. at 16. But, again, Price *told* the officers exactly what Cooks was doing—he was hiding guns, not a hostage.

In sum, the government failed to carry its burden of proving that the officers had "an objectively reasonable belief" that someone was in danger in Cooks's crawlspace. *See United States v. Timmann*, 741 F.3d 1170, 1178 (11th Cir. 2013). That scenario might have been within the realm of possibility, but "[s]uch speculation, without any factual support, will not suffice to overcome the warrant requirement." *See United States v. Lynch*, 934 F.2d 1226, 1233 (11th Cir. 1991).

28

**II.**

In an attempt to find objective facts supporting the exigent-circumstances exception, the majority improperly focuses on what the officers *did not know* at the time of the warrantless search, rather than what facts existed to support an objectively reasonable belief that a hostage was inside the crawlspace. *See, e.g.*, Maj. Op. at 2 ("Just as important here is what the officers didn't know . . . ."). Pointing out that the officers "were not sure whether there were others" in Cooks's home and that the officers "at the very least, couldn't rule out" the possibility of hostages in the crawlspace, Maj. Op. at 15 (emphasis omitted), turns the probable-cause inquiry on its head.

The concept of probable cause depends on objective facts and circumstances present at the time of the officers' conduct. *See, e.g.*, *Florida v. Harris*, 568 U.S. 237, 243 (2013) (holding that, in the Fourth Amendment context, an officer "has probable cause to conduct a search when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present" (internal quotation marks omitted)); *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (explaining that probable cause turns on "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information"). It does not depend on what officers cannot "rule out" or on what is within the realm of possibility. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)

("'[R]easonable suspicion' is a less demanding standard than probable cause."); *Lynch*, 934 F.2d at 1233 ("[S]peculation, without any factual support, will not suffice to overcome the warrant requirement.").

The analysis of probable cause in the exigent-circumstances context should be no different. Demonstrating that the officers had probable cause to believe that an exigent circumstance existed is a burden borne by the government. *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002). In the present case, the government pointed to no fact or circumstance "within [the officers'] knowledge and of which they had reasonably trustworthy information" to warrant a reasonable belief that there was a hostage in Cooks's crawlspace. *See Beck*, 379 U.S. at 91; *see also Harris*, 568 U.S. at 243. Nor did the government point to anything more than unparticularized speculation to support such a belief. *See Lynch*, 934 F.2d at 1233.

Although there *could have been* a hostage in the crawlspace, the officers lacked probable cause to believe that to be the case. If the exigent-circumstances inquiry turned on whether such a circumstance *could* exist, rather than on whether the officers had probable cause to believe that it did in fact exist, then officers would have license to search any crawlspace, closet, shed, or other enclosed space not covered by a lawful protective sweep by simply claiming that they could not "rule out" the possibility that someone was inside.

30

The majority's response to the officers' lack of probable cause to believe that a hostage was in the crawlspace is that the officers did not "need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." Maj. Op. at 17 (quoting *Michigan v. Fisher*, 558 U.S. 45, 49 (2009)). That, of course, is true. *See Illinois v. Gates*, 462 U.S. 213, 235 (1983) ("[S]tandards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision."). But the government still must demonstrate that such probable cause—"an objectively reasonable basis for believing" that someone was in danger, *see Brigham City v. Stuart*, 547 U.S. 398, 406 (2006)—existed. It failed to do so in the present case.

The majority also contends that this court cannot "armchair quarterback the officers' decision" because the police must act quickly when exigent circumstances exist. Maj. Op. at 14. But this contention begs the question of whether exigent circumstances actually existed in the present case. Our role as an appellate court indeed requires us to "armchair quarterback" that issue.

Here, the facts and circumstances do not support a finding that the officers had probable cause to believe that a hostage was in the crawlspace. Once the officers had secured Cooks and removed the only other known occupants from the home, they had no objective reason to immediately conduct a warrantless search of the crawlspace, a space that one of the occupants had *already told them* contained

31

multiple guns.  They thus had plenty of time to attain a search warrant, as they in fact eventually did.

### III.

I now turn to the cases that the majority cites to support its proposition that "searches under the emergency-aid exception have been upheld in circumstances that would seem to be far less ominous than those here."  Maj. Op. at 18.  Contrary to the majority's characterizations, those cases actually involve circumstances far *more* ominous than in the present case.  In *Michigan v. Fisher*, 558 U.S. 45 (2009), for example, the Supreme Court upheld a warrantless search under the exigent-circumstances doctrine where,

> [u]pon their arrival, the officers found a household in considerable chaos: a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows, the glass still on the ground outside.  The officers also noticed blood on the hood of the pickup and on clothes inside of it, as well as on one of the doors to the house. . . .  Through a window, the officers could see [the defendant] inside the house, screaming and throwing things.  The back door was locked, and a couch had been placed to block the front door.

*Id.* at 45–46.

The exigent-circumstances exception was found applicable in *Fisher* because, when the officers arrived, they "found signs of a recent injury, perhaps from a car accident, outside" and "could see violent behavior inside."  *Id.* at 48.  And, importantly, the officers were responding to a report of a disturbance when

32

they arrived at the defendant's home. *Id*. *Fisher*'s circumstances were thus far *more* ominous than the circumstances surrounding the warrantless search here, which provided no objective indication of recent injury or violence in Cooks's crawlspace.

The majority also cites *Johnson v. City of Memphis*, 617 F.3d 864 (6th Cir. 2010), as another case in which the exigent-circumstances exception was applied to what the majority inexplicably characterizes as "far less ominous" circumstances. Maj. Op. at 18. In *Johnson*, the Sixth Circuit held "that the combination of a 911 hang [up] call, an unanswered return call, and an open door with no response from within the residence is sufficient to satisfy the exigency requirement." *Johnson*, 617 F.3d at 869. But, as the court noted,

> [t]he whole point of the 911 system is to provide people in need of emergency assistance an expeditious way to request it. . . . Because a 911 call is by its nature an appeal for help in an emergency, the emergency aid exception best fits the attitude of police responding to a 911 call under the circumstances present here.

*Id.* at 870.

In contrast to *Fisher* and *Johnson*, the present case does not involve circumstances in which a reasonable officer would similarly infer that someone was in Cooks's crawlspace *and* in need of immediate aid. Neither *Fisher* nor *Johnson*, furthermore, analyzed whether entry into an enclosed space (such as a

33

crawlspace) within a defendant's home would have been justified under the circumstances of those cases.

Finally, I disagree with the majority's contention that this court's recent holding in *Montanez v. Carvajal*, 889 F.3d 1202 (11th Cir. 2018), supports the majority's conclusion. *See* Maj. Op. at 19. First, the holding of *Montanez* is relatively narrow. The court held that "if police have probable cause to suspect a residential burglary[,] . . . they may, without further justification, conduct a brief warrantless search of the home to look for suspects and potential victims." *Montanez*, 889 F.3d at 1208–09. And, as the majority recognizes, executing an arrest warrant does not carry the same risks inherent in responding to a residential burglary. Maj. Op. at 20.

More significantly, in conducting the search at issue in *Montanez*, the officers entered the home and discovered marijuana and drug paraphernalia *in plain view*. *Montanez*, 889 F.3d at 1206. The *Montanez* court accordingly limited its holding to allow only "a *brief* warrantless search of the home." *Id*. at 1209 (emphasis added). In the present case, the challenged evidence was not discovered in plain view, but rather by physically removing a screwed-down plywood covering from the crawlspace. *Montanez* is therefore inapposite.

## IV.

For all of the foregoing reasons, I believe that the exigent-circumstances exception did not justify the officers' warrantless search of the covered crawlspace in Cooks's home. I also fully agree with the district court's conclusion that the officers exceeded the scope of an otherwise lawful protective sweep when they pried open the crawlspace cover and searched the space inside. Accordingly, I would reverse the judgment of the district court and remand this case for further proceedings consistent with my dissent.