[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12440
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cr-20696-KMW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIE LEE JONES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 6, 2020)

Before WILSON, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Willie Lee Jones appeals his conviction for possession of firearms and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). On appeal, Jones argues that the district court erred by denying his pretrial motion to suppress statements he gave before officers advised him of his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966), and to suppress a firearm seized by police during a warrantless search while responding to a call about a domestic dispute with shots fired. After careful review, we affirm.

## I.

The relevant facts, as found by the district court following a suppression hearing, are as follows. At around 6:00 a.m. on August 28, 2017, Lieutenant Melissa Peacock responded to a dispatch describing a 911 "priority call" that reported a domestic-abuse incident with shots fired inside an apartment. When she arrived at the door of the second-floor apartment, she heard a distressed woman inside "banging and screaming" and what sounded like furniture being moved around or overturned within the apartment. Peacock knocked on the door, announced herself as law enforcement, and ordered the occupants to open the door. A male voice answered that "they're trying to kill me, I'm not coming out." A female voice stated that "he's not going to let me out."

2

Around this time, Officer Delvin Brooks arrived, and Peacock briefed him on the situation.[1]  A woman in the parking lot below the outdoor balcony to the second-floor apartment yelled to the officers that "he's got guns in there."  Peacock knocked on the door a second time.  Right around this time, a woman opened the door and exited the apartment, "crying hysterically" and carrying a child in her arms.  She walked away from the apartment and the officers.  As the woman exited, a male voice exclaimed that he was "going to kill them all."

Peacock looked inside the apartment, which was dark, and saw a man, later determined to be Jones, emerging from a back area.  The officers entered the apartment with guns drawn and ordered Jones to stop moving and get on the ground. Jones eventually complied, and Brooks moved to handcuff Jones while Peacock stepped past him and did a ten-second "sweep" of the apartment.  During this time, Jones made statements like, "they're in here, they're trying to kill us, they're all in here," indicating that individuals were shooting in or near the apartment in an attempt to kill him and his family.

Peacock returned to Jones and asked him, "where's the gun, hon?"  Jones stated that it was in the bathroom, though he denied that it was his.  Jones also denied that anyone else was in the apartment.  Peacock went to the bathroom to secure the

---

[1] Brooks was wearing a body camera that captured events following his arrival, and a recording was played at the suppression hearing.

gun, which was on the back of the toilet, and performed a "cursory search" of the apartment with her flashlight. Peacock first looked into the kitchen alcove on the right side of the apartment, and then crossed over to the other side of the unit to glance into the bedroom, where she observed two bullet holes in the bedroom window and a spent 9mm casing on the floor. She also found a live rifle round by the front door.

Jones continued yelling at the officers that other individuals were "trying to get in here," and that he "needed to protect his family." Peacock asked Jones how many rounds he had fired. Jones said he fired two or three shots "at the guys," explaining that several men had shot at the apartment trying to kill them and that "[his] girl" had been calling the police all night, but no one responded.

When backup officers arrived, Brooks took Jones outside, and officers were posted outside the apartment. Jones was taken to the hospital for evaluation. Meanwhile, Detective Tescha Harris was debriefed by Peacock and then approached Shavon Washington, the woman who had fled the apartment with her child at the outset of the confrontation. Washington stated that she rented the apartment and that Jones was her boyfriend. Harris asked Washington for consent to search the apartment and provided her a consent-to-search form, which Washington read and signed. Officers then searched the apartment and found two 9mm casings, a 9mm round, an assault-rifle round, and an assault rifle.

4

Based on these factual findings, the district court adopted a magistrate judge's report and recommendation and denied the motion to suppress. As to the evidence of the firearm found on the toilet, the court concluded that exigent circumstances justified entry into the apartment; that once inside, officers were entitled to conduct a protective sweep; and that the 9mm firearm found in plain view during the scope of that sweep was admissible. As to Jones's statements to officers, the court found that Peacock's questions fell within the public-safety exception to *Miranda* because officers had reason to believe that other persons were in or near the apartment and attempting to kill Jones and his family. Finally, the court concluded that officers validly obtained consent to search the apartment from Washington.

## II.

We review a district court's denial of a motion to suppress evidence for clear error as to factual findings and *de novo* as to its application of the law. *United States v. Watkins*, 760 F.3d 1271, 1282 (11th Cir. 2014). We may affirm the denial of a motion to suppress on any ground supported by the record, *United States v. McDowell*, 250 F.3d 1354, 1361 (11th Cir. 2001), and we may consider the entire record, including trial testimony, in determining whether suppression was properly denied, *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007).

## III.

5

Jones presents two arguments on appeal.  First, he contends that the firearm found on the toilet should be suppressed because law enforcement unlawfully searched the apartment without a warrant or exigent circumstances.  Second, he argues that his statement identifying the location of that firearm should be suppressed because he was interrogated at the scene in violation of *Miranda*, and that his involuntary statement tainted all subsequent events.  We address each argument in turn.

## A.

The Fourth Amendment protects "against unreasonable searches and seizures" of the home.  U.S. Const. amend. IV.  Warrantless searches and seizures within a home are presumptively unreasonable.  *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015); *Bashir v. Rockdale Cty., Ga.*, 445 F.3d 1323, 1327 (11th Cir. 2006).  This general rule is "subject only to a few jealously and carefully drawn exceptions."  *McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007) (quotation marks omitted).  Among them, "the police may enter a private premises and conduct a search if 'exigent circumstances' mandate immediate action."  *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002) (citing *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)).  Any contraband found in plain view during such a search may lawfully be seized.  *See Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971) ("Where the initial intrusion that brings the police within plain view of such an

6

article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.").

"[E]mergency situations involving endangerment to life fall squarely within the exigent circumstances exception." *Holloway*, 290 F.3d at 1337.  Specifically, warrantless searches and seizures of a home are constitutional "[w]hen the police reasonably believe an emergency exists which calls for an immediate response to protect citizens from imminent danger." *Id.*  When evaluating whether this "emergency aid" exception applies, the officers' subjective motivations are irrelevant.  *United States v. Timmann*, 741 F.3d 1170, 1178 (11th Cir. 2013).  And "we must be mindful that the police must act quickly, based on hurried and incomplete information."  *United States v. Cooks*, 920 F.3d 735, 743 (11th Cir.) (quotation marks omitted), *cert. denied*, 140 S. Ct. 218 (2019).

In *Holloway*, we applied the emergency-aid exception to validate a warrantless search of a home for victims of gunfire.  290 F.3d at 1338.  Officers responded to two dispatches relaying reports of gunshots and arguing at a mobile home.  *Id.*  When they arrived, they found and temporarily secured the defendant and his wife, who were on the front porch.  *Id.* at 1338, 1340.  An officer then conducted a limited search of the home for victims of gunfire, finding a shotgun in plain view.  *Id.* at 1340.  We held that the warrantless search was constitutional because the officers reasonably believed an emergency situation justified a

7

warrantless search of the home for victims of gunfire. *Id.* at 1338. And because the exigencies of the situation justified the officers' presence inside the home, the officers were authorized to seize the shotgun in plain view without a warrant. *Id.* at 1340.

Separate from the emergency-aid exception, the Fourth Amendment "allows some warrantless protective sweeps of a defendant's home to ensure the safety of police officers and others." *United States v. Noriega*, 676 F.3d 1252, 1259 (11th Cir. 2012). "A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (2012) (quotation marks omitted). A protective sweep is authorized when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334.

Here, the district court properly denied suppression of the firearm. Jones admits that the officers' warrantless entry into the apartment was justified by the emergency-aid exception. We agree. Lieutenant Peacock responded to a dispatch describing a 911 "priority call" reporting a domestic-abuse incident with shots fired inside the apartment. When she arrived at the apartment, she heard a woman inside

8

pleading to be let out and a man refusing to open the door because unidentified individuals were trying to kill him. Soon after, a neighbor stated that Jones had guns in the apartment and a woman opened the door carrying a child and fled the apartment "crying hysterically." We think it's clear from these facts that, as Jones states, "the officers were justified in reasonably believing that there may have been someone in danger within the apartment." Jones Initial Br. at 9.

We are not persuaded by Jones's claim that this exigency ended once he was handcuffed on the ground. Based on the 911 call reporting gunshots and a domestic disturbance, combined with Peacock's initial observations upon arriving at the scene, the officers were, as in *Holloway*, permitted to conduct a limited search of the home for victims of gunfire. *See Holloway*, 290 F.3d at 1338 (report of gunshots and domestic disturbance justified entry and warrantless search). While Jones asserts that the officers should have known that no one else was in the apartment based on comments by Jones and Washington, we are mindful that "officers must be given the authority and flexibility to act quickly, based on limited information, when human life is at stake." *Cooks*, 920 F.3d at 743 (quotation marks omitted). In the circumstances presented, it was objectively reasonable for Peacock to verify Jones's claim and ensure that no victim needed immediate assistance.

Jones claims that Peacock used information learned during the sweep to justify the sweep itself. But we need not credit Peacock's explanation of her reasons

9

for taking the actions that she did.  Peacock's subjective beliefs and motives are irrelevant to the Fourth Amendment inquiry.  *See Timmann*, 741 F.3d at 1178.  What matters is whether her actions were objectively reasonable.  And for the reasons we have explained, we conclude that they were.

Moreover, the "cursory search" described by Peacock did not exceed the limited scope of searches authorized under the emergency-aid exception.  *See Cooks*, 920 F.3d at 746 ("The ultimate question is whether the intrusion was strictly circumscribed and limited to the areas where a person reasonably could be found." (quotation marks omitted)).  Jones makes no claim that the bathroom was not within the realm of areas where a victim might be found.  Nor does he dispute that the firearm on the back of the toilet was in plain view of an officer looking into the bathroom or that Peacock had probable cause to seize the gun as evidence.  Because Peacock was authorized to be in the position from which she could seize the firearm, seizure was permitted under the plain-view doctrine.  *See Coolidge*, 403 U.S. at 465.

Alternatively, we agree with the district court that Peacock's "cursory search" of the apartment was authorized under the "protective sweep" doctrine.  *See Timmann*, 741 F.3d at 1181 ("A protective sweep may also be undertaken without an arrest warrant, so long as the officers are lawfully within the premises due to, for example, the existence of exigent circumstances.").  Upon entering the apartment, officers had reason to believe that shots had been fired inside the apartment, that a

10

woman fled the scene because she felt she and her child were in danger, and that

Jones had threatened to kill unidentified individuals who were "trying to kill [him]."

From this information, the officers had "articulable facts which, taken together with

the rational inferences from those facts, would warrant a reasonably prudent officer"

in believing that an individual in or near the apartment "pos[ed] a danger to those on

the arrest scene." *Buie*, 494 U.S. at 334.

Accordingly, it was objectively reasonable for Peacock to conduct a protective

sweep of the residence to ensure the safety of Jones and the other officers. And the

scope of a protective-sweep search, like the scope of a search under the emergency-

aid exception, included the bathroom because it was a place in which a person posing

a danger to the officers might be hiding. *See id.* at 334–35.

For these reasons, Jones has not shown that officers violated his Fourth

Amendment rights in conducting a brief, warrantless search of the apartment.

**B.**

When a person is "in custody," he or she generally may not be questioned

before being informed of his or her *Miranda* rights. *New York v. Quarles*, 467 U.S.

649, 654 (1984). A narrow exception to this rule applies where there is a threat to

the safety of the public or law-enforcement officers. *Id.* at 656, 658. "The public

safety exception allows officers to question a suspect without first Mirandizing him

11

when necessary to protect either themselves or the general public." *Newsome*, 475 F.3d at 1224.

In *United States v. Newsome*, we applied the public-safety exception in a case where the defendant was taken into custody while in a motel room for the non-fatal shooting of his wife and child. 475 F.3d at 1223. While on the ground and before he was read his *Miranda* rights, an officer asked him if there was "anything or anyone in the room that [the officer] should know about." *Id.* The defendant advised the officer that he had a gun "over there," and motioned with his head towards a nightstand. *Id.* When the officer did not see the gun, he asked the defendant where it was, and the defendant pointed the officer to a black bag containing the weapon. *Id.* The defendant sought to suppress his statements and the gun. *Id.*

We concluded that under the public-safety exception, the statements and gun were admissible. *Id.* at 1224–25. Although the defendant argued that the officers questioned him after the room was secured, we explained that the evidence showed "a very rapid sequence of events," where the defendant was questioned "right after the officers ordered him to the ground and while he was being searched." *Id.* at 1225. We further noted that at the time of entry, the officers were under the impression that another person was also in the room, so officers could have reasonably been concerned that the other person could be hiding in the room, ready to ambush them. *Id.* Therefore, we explained, the officers acted appropriately to

12

protect themselves and other motel guests. *Id.* We also found that the officer "asked what was necessary to secure the scene," noting that the officer followed up his broad question by attempting "to pinpoint the exact location of the gun." *Id.* ("An officer is not expected to craft a perfect question in the heat of the moment.").

Here, the district court properly denied suppression of Jones's statement identifying the location of the gun because the public-safety exception applies. As we have discussed above, officers entered the apartment in response to a 911 call that reported a domestic disturbance and shots fired within the apartment. Before the officers asked Jones any questions, a bystander had stated that Jones was armed, a woman fled the apartment "crying hysterically," and an agitated Jones threatened violence against unnamed individuals who, he said, were "in here" and trying to kill him and his family. Accordingly, the officers had reason to believe that there was at least one firearm that had been fired in the apartment and that other individuals might have been in or near the apartment. *See United States v. Ochoa*, 941 F.3d 1074, 1096–98 (11th Cir. 2019) (stating that, even in the absence of "specific reason to suspect that any particular person remained in the residence," the officer was reasonably concerned that others remained).

Jones argues that there was no public-safety rationale for Lieutenant Peacock's question—"where's the gun, hon?"—once Jones was restrained because he could not access the firearm and everyone in the apartment had been accounted

13

for.  But as in *Newsome*, the evidence at the suppression hearing showed "a very rapid sequence of events."  *Newsome*, 475 F.3d at 1225.  Peacock asked Jones where the gun was "right after the officers ordered him to the ground and while he was being secured."  *Id.*  At the time the question was asked, the officers did not know where the gun was, and Peacock reasonably could have been concerned that the gun may have remained within Jones's reach, if he broke Officer Brooks's hold on him.

For these reasons, we conclude that Peacock's question concerning the location of the gun was permissible for officer safety under the public-safety exception.  "And "[b]ecause there was no Fifth Amendment violation, the evidence obtained from the search was properly admitted."  *Id.* at 1226.

### IV.

In sum, we affirm the denial of Jones's motion to suppress.

**AFFIRMED.**

14